## EDWARD H. LITCHFIELD, Appellant, v. EDWARD A. POND et al., Respondents.

1. PUBLIC OFFICERS — UNAUTHORIZED ACTS OF STATE ENGINEER IN MAKING A STATE SURVEY, WHEN A TRESPASS. Where the agents of the state, for the purpose of establishing a boundary line between counties, enter upon private land, without statutory authority and without the consent of the owner, and appropriate a strip of land three and a quarter miles in length and several feet wide, fell trees thereon and otherwise damage the property, such acts constitute a trespass for which said agents are individually liable. While the state has the right to enter upon private lands for the purpose of surveying and locating boundary lines, its agents exceed their lawful powers when, without provision for compensation, they inflict substantial and permanent damages upon such property in locating a permanent base line, although the work is done with due care and skill.

2. EXERCISE OF POLICE POWER NOT WARRANTED. In the absence of any overwhelming necessity or emergency requiring immediate action, the police power cannot be properly invoked to justify such action.

3. EXERCISE OF POWER OF EMINENT DOMAIN NOT AUTHORIZED BY STATUTE DIRECTING SURVEY. Nor does a statute (L. 1902, ch. 473) directing the state engineer to "locate, establish and permanently mark upon the ground" the boundary line in dispute and appropriating $40,000 for the purposes of the act, authorize him, as an agent of the state, to exercise the power of eminent domain in order to effect the purpose of the act, in the absence of any indication of an intent to confer such power and of any provision for compensation for private property to be taken and destroyed.

4. SUBSEQUENT STATUTE INEFFECTIVE AS A RATIFICATION BY THE STATE. Nor does a statute (L. 1903, ch. 348) enacted subsequently to the trespass, even if authorizing the taking or invasion of private property for public use, afford any protection to the wrongdoers as against the owner where his property has been taken before its passage.

5. GENERAL POWER OF THE STATE TO MAKE A SURVEY INSUFFICIENT AS A JUSTIFICATION. Nor can the trespass be justified as having been committed in the exercise of the general and inherent power of the state in making a survey for the establishment of disputed boundary lines between counties; while the state may, through its agents, enter upon and temporarily occupy private lands, or even commit acts thereon that are ordinarily classified as technical trespasses without becoming liable to compensate the injured owner, there is immunity from liability only to the extent that the entry or occupation is temporary, or the infliction of dam-

age is incidental and incipient or preliminary — if the occupation is to be permanent or the damage is to be substantial, then the state and those assuming to act under it must invoke those powers under which such things may lawfully be done.

6. CONSTITUTIONAL LAW — ACTS CONSTITUTING A TAKING OF PROP- ERTY. Such an entry and occupation is a taking of property within the meaning of the State and Federal Constitutions.

7. REMEDY OF LANDOWNER NOT CONFINED TO COURT OF CLAIMS. The fact that by an act passed after the commission of the trespass (L. 1904, ch. 561) the Court of Claims was authorized to determine the damages result- ing from such trespass, does not relegate the landowner to that court as the only forum in which he can prosecute his claim therefor, where such act expressly disclaims the creation or acknowledgment of any liability upon the part of the state.

8. THE STATE NOT LIABLE FOR THE TORTIOUS ACTS OF ITS OFFICIALS. The state as an entity cannot commit a trespass. It is liable for the tor- tious acts of its officers or agents only in special instances expressly created by law. When, therefore, public officers assume to act for the state, and although acting in good faith and believing themselves authorized to act for it, take and destroy property without due process of law and just com- pensation, their acts, being contrary to law, cannot be the acts of the state, but are their individual acts, for which they alone are responsible; and an action is maintainable against them personally to restrain the further commission of such unlawful acts and to recover the damages already accrued.

*Litchfield* v. *Bond,* 105 App. Div. 229, reversed.

(Argued June 8, 1906; decided October 2, 1906.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered May 22, 1905, affirming a judgment in favor of defendants entered upon the report of a referee.

The plaintiff is the owner of some nine thousand acres of land, situated in the southwesterly corner of Franklin county, in this state, of which he has made a park; inclosed by a steel wire fence, stocked with large and small game and, more or less, laid out in carriage drives. The defendants are the state engineer of this state and his assistants and this action was brought to restrain them from entering, or doing acts, upon the plaintiff's premises, in effectuating the provisions of

an act of the legislature, relating to the establishment of the boundary lines of certain counties. Upon the trial of the action, the plaintiff's complaint was dismissed, upon the report of the referee before whom the case was tried, and the judgment upon the report has been unanimously affirmed by the Appellate Division, in the third department. The decision of the referee was formulated in findings and, therefore, so far as the facts are concerned, they are conclusively settled upon this appeal by the plaintiff.

It appears that, in 1902 and theretofore, there had been a controversy over the boundary line between the counties of Franklin and St. Lawrence on the north and the counties of Lewis, Herkimer, Hamilton and Essex on the south. Chapter 473 of the Laws of 1902 was passed by the legislature as an act providing for the establishment of this line. Thereunder, the state engineer, with his assistants, undertook the work, directed to be performed by the act, and prosecuted it in good faith. The state engineer directed that the making of the survey and the marking of the boundaries required by the statute should be according to the straight base line method of survey; which was the one best adapted to the proper performance of the work, in securing the most certain and permanent results. What other methods of doing such work may have been practiced were found to be inferior. · In prosecuting · the survey, the assistants of the state engineer climbed the fence, surrounding the plaintiff's park, and cleared a "slash," or cutting, through the standing timber in his woods, which was, from first to last, some three and a quarter miles in length, varied from twenty-five to thirty-five feet in width for a quarter of a mile and, for the rest of the distance, from three to six feet, and involved the cutting down of some fourteen hundred trees. The surface thus cleared amounted to about one and eighty-six one-hundredths acres. It was, further, found with respect to the performance of the work that this cutting, while not upon the boundary line, "served as a base line from which to locate the boundary line.

which was to be marked and was made for a purpose, in its nature temporary and incidental to the location and marking, prescribed by the statute." When making the survey, according to the straight base line system, except as to the cut timber being left upon the ground, the work was done with care and skill; the cutting, or "scar," was remote from the plaintiff's buildings and roads and it was only noticeable from points in a line with it, or within a few hundred feet of it. The merchantable value of the wood cut from the "slash" was about one hundred dollars less than the cost of removing it and the impairment in value of the plaintiff's preserve, as an entirety, amounted to five hundred dollars.

According to the judgment of the referee, the plaintiff failed to make a case for relief, either upon the ground that the defendants were exercising a discretionary power, not reviewable by the courts; or, if the power was reviewable, upon the ground that it appeared to have been the best and only method of survey. He thought, too, that any taking of property of the plaintiff was under the exercise of the police power of the state.

The Appellate Division, however, differed from the referee, in opinion, with respect to the theory upon which the acts of the defendants were justifiable, and that court entertained the view that, whatever was done, or taken, by the defendants, it was under the right of eminent domain. While the exercise of that power was subject to the statutory limitation that just compensation must be made, the Appellate Division held that the Court of Claims was open to the plaintiff as a court with competent jurisdiction to pass upon his claim for compensation.

*William G. Wilson* for appellant. The police power, properly so called, is limited to the control, for the public good, of the conduct of individuals and the use of their property. (*Munn* v. *Illinois*, 94 U. S. 113; *Thorpe* v. *B. & B. R. R. Co.*, 27 Vt. 143; *Reagan* v. *F. L. & T. Co.*,

154 U. S. 362; *U. S.* v. *Lynch,* 188 U. S. 445.) The exercise of the right of eminent domain must be attended by a sure and adequate provision for compensation. (*Sage* v. *City of Brooklyn,* 89 N. Y. 189; *Matter of Mayor, etc.,* 99 N. Y. 569; *People* v. *Hayden,* 6 Hill, 359; *C. R. R. R. Co.* v. *Comrs.,* 127 Mass. 50; *Bloodgood* v. *M. & H. R. R. Co.,* 18 Wend. 9; *Traction Co.* v. *M. Co.,* 196 U. S. 239.) Injury to, or destruction of, property is a taking within the meaning of the constitutional provisions. (*Wynehamer* v. *People,* 13 N. Y. 378; *People* v. *Otis,* 90 N. Y. 48; *Forster* v. *Scott,* 136 N. Y. 577; *Pumpelly* v. *G. B. Co.,* 13 Wall. 166.) Chapter 473 of the Laws of 1902 was not effectual as an exercise of the right of eminent domain, nor was it intended as such. (*Cogswell* v. *N. Y., N. H. & H. R. R. Co.,* 103 N. Y. 10; *W. U. T. Co.* v. *P. R. R. Co.,* 195 U. S. 540; *Sipple* v. *State,* 99 N. Y. 284; *Woodman* v. *State,* 127 N. Y. 397; *Mayor, etc.,* v. *Furze,* 3 Hill, 612.) The defendants are personally liable. (*Adsit* v. *Brady,* 4 Hill, 630; *Robinson* v. *Chamberlain,* 34 N. Y. 389; *People* v. *Canal Board,* 55 N. Y. 390; *St. Peter* v. *Denison,* 58 N. Y. 416; *Matter of Ayres,* 123 U. S. 443.)

*Julius M. Mayer,* Attorney-General (*James G. Graham* of counsel), for respondents. The legislature had full power and authority to fix the boundaries, and by survey to determine the location thereof on the ground in order to establish the proper county lines in the disputed territory. (*People ex rel. Williams* v. *Dayton,* 55 N. Y. 378; *People ex rel. Joyce* v. *Brundage,* 78 N. Y. 403.) Injury to private property incidental to the valid exercise of the police power of the state affords no cause of action. (Cooley on Const. Lim. [7th ed.] 813, 829; *Watertown* v. *Mayo,* 109 Mass. 315; *Winslow* v. *Gifford,* 6 Cush. 327; *Green* v. *New York,* 2 Hilt. 203; *Folcomb's Case,* 5 Coke, 116; *Beatty* v. *Perkins,* 6 Wend. 382; *Bell* v. *Clapp,* 10 Johns. 263; *Winslow* v. *Gifford,* 6 Cush. 327; *Orr* v. *Quimby,* 54 N. H. 590; *L. I.*

*Co.* v. *Seymour,* 35 N. J. 53; *Edwards* v. *Law,* 63 App. Div. 451.) The temporary occupation of appellant's land and the acts committed thereon were in the exercise of the right of eminent domain. (*People* v. *A. R. R. Co.,* 160 N. Y. 236.) The defendants in locating, establishing and permanently marking upon the ground said boundary lines were acting under the protection of legislative authority. (L. 1902, ch. 473; *Garratt* v. *Trustees,* 135 N. Y. 436; *People ex rel. Huntington* v. *Crenan,* 141 N. Y. 239; *People ex rel. Hall* v. *Bd. of Suprs.,* 30 Abb. [N. C.] 421.) The acts of the defendants were authorized, ratified and confirmed by the state, and liability for damages, if any, occasioned thereby, assumed by it. (L. 1902, ch. 473; L. 1903, ch. 348.) The legislature having authorized, ratified and confirmed the acts of the defendants and having provided compensation for property taken or damage done, or a means of securing the same at the time the decision was rendered, the judgment should be affirmed. (Cooley on Const. Lim. [7th ed.] 543; *Matter of Davis,* 149 N. Y. 539; *People* v. *Turner,* 117 N. Y. 227; *Turner* v. *New York,* 168 U. S. 90.)

Werner, J. The plaintiff is the owner of about 9,000 acres of forest land in the Adirondack mountains. This tract he inclosed and improved as a park and game preserve, which was brought within the protection of the law by the posting of proper notices. In 1902 the defendants entered upon these premises and denuded of its growth of forest trees a strip of about 3¼ miles in length and from 3 to 8 feet wide, except for a distance of 1,350 feet where the cutting was from 25 to 35 feet in width. Upon a complaint which alleged these facts and contained averments of further threatened devastation of plaintiff's preserve by the defendants, the court granted a preliminary injunction restraining *pendente lite* the further commission of similar acts. There was no conflict of evidence as to the principal facts; the real defense being, that in the commission of the alleged trespasses the defendants were agents of the state engaged in the making of a survey under

legislative authority, and that nothing had been done upon the plaintiff's land that was not essential to the proper performance of the work. At the trial the learned referee gave judgment for the defendants, holding that in the commission of the acts complained of the defendants were agents of the state, which, in the exercise of its police power, had done nothing to invite or justify judicial interference with its agents. At the Appellate Division this judgment was unanimously affirmed, not upon that ground, but because the legislative enactment, under which the defendants sought to justify their procedure, contained inherent but obscure indications of the state's purpose to exercise the right of eminent domain, under which the only remedy open to the plaintiff is a resort to the Court of Claims for such damages as he may have suffered. On the present appeal it is sought to sustain the decisions below by discarding both of these divergent theories and justifying the action of the defendants under the state's general governmental power to establish boundary lines between its political subdivisions. In view of this diversity of opinion I venture to join the symposium of judicial disagreement with a fourth proposition under which I shall endeavor to demonstrate the error of the three preceding conclusions and to establish the plaintiff's right to maintain the action at bar.

To this end I invite attention to the initial fact that the dispute as to the boundary lines between the counties of Franklin, Hamilton, St. Lawrence and Essex, which is the underlying cause of this controversy, had existed for over a hundred years prior to 1902, so that there was no occasion for emergent action on the part of the state. A controversy of such long standing, even though it involved the jurisdiction of courts, the right of the franchise and the power of taxation, presented no exigency that required the immediate and arbitrary exercise of the police power or the law of overwhelming necessity in the invasion of private rights. (*Am. Print. Works* v. *Lawrence*, 23 N. J. Law, 590; *Matter of Jacobs*, 98 N. Y. 108; *Wynehamer* v. *People*, 13 N. Y. 401.)

It is to be observed, moreover, that the police power, which is concededly an inherent attribute of sovereignty, should be permitted to override or nullify our constitutional limitations only in cases of the highest public necessity. That governmental power, like every other, is subject to the Constitution, and when it is paramount it is because it is not limited by the Constitution, or because some immediate and overruling emergency calls for the application of the maxim *salus populi suprema lex*. If the trespasses complained of by the plaintiff were merely those of agents of the state, committed while necessarily engaged in the making of a survey to establish the boundary lines of civil divisions thereof, and which involved no such taking of private property for public use as to bring the plaintiff within the protection of the constitutional provisions embracing that subject, then it is obvious that there was neither occasion nor right for the exercise of the police power, since the inherent governmental power of the state, unrestricted by the Constitution, was ample for that purpose; and that assumption would, of course, necessarily compel the concession that the plaintiff's loss would be *damnum absque injuria*. It seems equally clear, however, that if the acts of the defendants went so far beyond the necessary incidents of a governmental survey as to involve the taking of plaintiff's private property for an alleged public use, the state is liable if the taking is authorized by its legislative direction, and the trespassers are liable if there is no such authority. This brings us logically to the discussion of the power of eminent domain, and to the assertion that it was exercised against the plaintiff under the statute invoked by the defendants.

The learned Appellate Division, although placing its decision upon the ground that the defendants' invasion of the plaintiff's land could be justified under the state's power of eminent domain, conceded " that much, of necessity, must be read into the statute authorizing condemnation," but concluded that " in one form or another, if the State through its officers has caused injury to the plaintiff in the prosecution of

a public work commanded by its legislature, * * * the Court of Claims must be open to him to prove and recover his damage." I think this position is utterly untenable. It is the settled law of this state that an injury to private property cannot be justified by the plea of a statutory sanction unless the latter is expressly given, or may be so clearly implied from the powers expressly conferred that the doing of the act which occasioned the injury can fairly be said to be within the legislative contemplation. (*Cogswell* v. *N. Y., N. H. & H. R. R. Co.*, 103 N. Y. 10, 21.) Even under the most liberal reading of the statute now under consideration (L. 1902, ch. 473) it is impossible to find in it a single word or sentence indicating that the state proposed to exercise its right of eminent domain, or to make compensation for private property taken or destroyed. The legislative direction to the state engineer and surveyor was to "locate, establish and permanently mark upon the ground" the boundary line in dispute, and the sum of forty thousand dollars was appropriated, not to pay for property taken or to liquidate damage inflicted upon property owners, but for the purpose of the act; that is, to pay the necessary expenses of the survey. This is made clear beyond a doubt by a subsequent section of the statute limiting the amount which the state treasurer was authorized to pay on account of the work during the years 1902 and 1903, and providing for the final expenditure in 1904 "of twelve thousand dollars, or so much thereof as may be necessary for the completion of the work." Such a statute, if intended to authorize the exercise of the right of eminent domain, would be clearly unconstitutional, because it makes no provision for compensation to those whose private property is to be taken for a public use. While payment need not precede the taking, the provision for compensation must not only pre-exist, but it must be so definite and certain as to leave nothing open to litigation except the title to the property taken and the amount of damages which the owner may recover. (*Sweet* v. *Rechel*, 159 U. S. 380, 398; *Sage* v. *City of Brooklyn*, 89 N. Y. 189, 195; *Matter of Mayor, etc.*,

*of N. Y.*, 99 N. Y. 569, 577; *Brewster* v. *Rogers Co.*, 169 N. Y. 73, 80.)

It seems equally clear, also, that if the statute did not direct, and was not intended to authorize the exercise of the power of eminent domain, the defendants can claim no protection under it, and the immunity from liability for which they contend must be sought in some other direction. For this purpose we are referred to the statute of 1903 (Chap. 348), which enacts that, " For the purpose of making the surveys and performing the work provided for by this act, to the extent deemed necessary by the state engineer for such purpose, stating the purpose and extent thereof, the state engineer and surveyor, and upon his written authority, his assistants, agents, employees and servants, are hereby authorized and empowered to enter in and upon any and all lands in this state to whomsoever belonging and to do and perform any acts or act whatsoever necessary to do and fully complete such work and surveys, subject to liability only for payment of all damages on account of entry upon such lands and acts done thereon." This statute, if read literally and according to strict grammatical criticism, authorizes the state engineer and his assistants to do certain things, subject to individual liability for damages inflicted by their entry upon any lands. The defendants, and not the state, are to be liable for such damages. But that is a mere technicality, which, in the consideration of fundamental principles, may be passed without further mention.

When we undertake to find in the statute a legislative purpose to subject the state to liability for damages inflicted upon the private owner in the performance of this public work, we perceive more clearly the real and substantial objections to its use by the defendants as a shield against their wrongful acts. It was enacted in 1903, or something like a year after the commission of the alleged trespasses. To the extent that it may have been designed as a statute authorizing the taking or invasion of private property for the public use, it fails of its purpose, so far as the plaintiff is concerned, because his prop-

erty had been invaded before its passage.   There is nothing
retroactive in its letter, and it could not be retroactive in
effect, for, as we have seen, it is one of the cardinal essen-
tials of a statute authorizing the taking of private property
for public use that provision for compensation must precede
the taking or entry.   The theory of respondent's counsel that
the statute of 1903 operated to ratify and confirm the acts of
the defendants upon the plaintiff's lands is untenable for two
reasons: 1. If the statute of 1902 was effective to authorize the
taking of or entry upon the plaintiff's lands, there was no need
of ratification or confirmation, and in that view the so-called
confirmatory statute of 1903 would be just so much waste
paper.   2. If the statute of 1902 did not authorize the entry
upon or taking of plaintiff's lands under the state's power of
eminent domain the defendants were naked trespassers just in
so far as they transcended, if they did transcend, the general
governmental powers which inhere in the state's right to make
surveys and delimit the boundaries of its civil divisions, and in
that aspect of the case the unauthorized acts committed by the
defendants upon the plaintiff's lands were wrongful and could
be ratified by no one but the plaintiff.   The statute of 1903,
instead of being an attempted governmental ratification of the
acts of a state agency, seems to be nothing more than a legis-
lative admission of the insufficiency of the statute of 1902 to
authorize such acts as were committed by the defendants upon
the lands of the plaintiff.

Thus we are brought to the consideration of the two real
questions upon which the fate of this litigation depends:
1. Whether the defendants' invasion of the plaintiff's prem-
ises was within the general and inherent power of the state in
making a survey for the establishment of the disputed bound-
ary lines of the counties named.   2. Whether the plaintiff's
remedy, if the defendants' acts were in excess of such gov-
ernmental power, lies in the Court of Claims in an action
against the state, or in a court of general equity jurisdiction
in a suit against the actual wrongdoers.

The power of the state to make surveys for public improve-

ments and to mark the boundaries of its civil divisions is so universally recognized that it may be conceded without discussion. In the case at bar we are not so much concerned about its existence as with its limitations. The existence of the power necessarily implies the right to make it practical and effective. For that purpose the state through its agents may, doubtless, enter upon and temporarily occupy private lands, or even commit acts thereon that are ordinarily classified as technical trespasses, without becoming liable to compensate the injured owner. It must be, however, that this arbitrary power has its limitations, and while these are no more clearly definable than the power itself, they are to be looked for in the special circumstances of each separate case. The statement of a few generalizations taken from learned authors cited by the respondents will serve to mark the angle from which the question should be viewed in the case at bar. "In the construction of public improvements, as railroads or canals for instance, before it is known that the land will be wanted, preliminary steps, such for instance as surveys, are indispensably necessary. These preliminary steps are in themselves a trespass, and may sometimes, as by felling trees, work actual injury to the proprietor. On the other hand, if payment be not made before the work is actually begun, then, if it be discontinued or left in imperfect state, the owner might be entirely remediless. In such a conflict of interests the current of decisions seems to tend to establish the rule that the preliminary steps in regard to public works may be taken without any compensation, but that before any definite act be done toward the construction of the improvement, which is in the nature of the assertion of ownership, payment must be made or tendered, or a certain and adequate remedy be provided, and unless this is done in the act authorizing the work, the statute is wholly unconstitutional and void, and any step taken under it is an unauthorized trespass." (Sedgwick on Construction of Stat. & Const. Law, pp. 467, 468.) "It is settled that the legislature may authorize railway companies to enter upon land for the purpose of preliminary surveys with-

out making any compensation therefor, doing as little damage
as possible, and selecting such seasons of the year as will do
least damage to the growing crops." (Redfield on Railways
[5th ed.], p. 258.) "When a surveyor or engineer is an officer
of the state or of the Federal government, or is acting by
authority of either, or under powers granted to a corporation
by the legislature, he is authorized to enter upon lands and
perform his work, and cannot be interfered with, if acting
within the scope of his duties. The entry must be for a tem-
porary purpose and be accompanied with no unnecessary
damages. Preliminary surveys may be authorized by the
state without compensation being previor ly paid or secured
by an owner. This is so even though the Constitution requires
the payment of compensation to precede a taking, on the
ground that no estate is thereby taken." (Wait on Law of
Operations Preliminary to Construction and Engineering,
sec. 353.) " No constitutional principle is violated by a statute
which allows private property to be entered upon and tem-
porarily occupied for the purposes of survey and other incip-
ient proceedings with a view of judging and determining
whether the public needs require the appropriation or not,
and if so what the proper location shall be; and the party
acting under this statutory authority would neither be bound
to make compensation for the temporary possession, nor be
liable to an action of trespass. When, however, the land
has been viewed, and a determination arrived at to appropri-
ate it, the question of compensation is to be considered."
(Cooley's Const. Lim. [7th ed.] p. 813.) These extracts from
the writings of learned commentators upon subjects germane
to the question under consideration, clearly indicate that in
the prosecution of public works by or under the authority of
the state, except under the right of eminent domain or com-
mon-law necessity, there is immunity from liability for entry
upon private lands, only to the extent that the entry or occu-
pation is temporary, or the infliction of damage is incidental
and incipient or preliminary. If the occupation is to be per-
manent or the damage is to be substantial, then the state and

those assuming to act under it must invoke those powers under which such things may lawfully be done. The case at bar differs in circumstance, but not in principle, from the illustrations taken from the learned authors above referred to. Here the permanent demarkation of boundary lines between several counties was the permanent work to be done. To that end a preliminary survey was necessary, and that could not be made without entry upon some private lands. It is reasonable to suppose that, to some extent, the blazing of trees, or the felling of an occasional tree, might be regarded as indispensable, and that the ordinary monuments of the surveyor's profession might have to be established on private lands. All this, and perhaps more, may fairly be considered as comprehended in the legislative direction " to locate, establish and permanently mark upon the ground " the disputed boundary lines. In the case at bar the defendants did not stop at these temporary, preliminary, incipient and incidental things which, as we have seen, may be done without making compensation or incurring liability, but they proceeded to practically appropriate a strip of plaintiff's land, three and one-half miles in length and from five to twenty-five feet in width, not temporarily, but for the purpose of permanently establishing a base line, from which the boundary line could be the more readily and permanently located. This base line consisted of a " slash " in the woods covering the whole of the territory above mentioned, that it will take eighty years of timber growth to repair. And this was done, not as a necessary and essential part of the survey, or upon the line thereof, but wholly upon the plaintiff's land, and purely because, in the judgment of the state engineer, such a " slash " would make a more permanent auxiliary or sighting line to the true boundary than any other method that could have been employed. We must assume, for the referee has found, that the method employed was " the one best adapted to the proper performance of the work prescribed," and was designed to secure the most certain and permanent results. For the purposes of illustration let us suppose that the most approved and up-to-date method of survey-

ing for boundary lines required the building of a stone wall on private property from 5 to 35 feet in width for a length of 3½ miles; or that such a structure, or a "slash" like the one described in the record should occupy all the land of a private owner; or that the owner's residence, which happened to be where the base line was desired to be established, was razed to the ground and the materials scattered over the ground. Would any such entry and occupation by the agents of the state be justifiable under the state's inherent power to survey and mark boundary lines? I think not. And if not, then how can the acts herein complained of be justified? The difference between the illustrations and the fact is one of degree and not of kind. It is to be emphasized again, moreover, that the "slash" cut upon plaintiff's premises was not designed to mark the boundary line or to establish a permanent monument upon it, but to maintain an independent base line for convenient future reference. This was not, in my judgment, such an establishment and permanent marking of the boundary line upon the ground as was contemplated by the statute.

We deem it unnecessary to discuss at length the proposition that such an entry and occupation as is conceded to have been made upon the plaintiff's land is a taking of property within the meaning of our State and Federal Constitutions. "Depriving an owner of property of one of its essential attributes is depriving him of his property within the constitutional provisions." (*People ex rel. Manh. S. Instn.* v. *Otis,* 90 N. Y. 48–52.) "When a law annihilates the value of property and strips it of its attributes, by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the spirit of a constitutional provision intended expressly to shield private rights from the exercise of arbitrary power." (*Wynehamer* v. *People,* 13 N. Y. 378.) "Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or com-

pensation, it deprives him of his property within the meaning of the Constitution." (*Forster* v. *Scott*, 136 N. Y. 577.) "It would be a very curious and unsatisfactory result if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against government, and which has received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrained from the absolute conversion of real property to the uses of the public, it can destroy its value entirely; can inflict irreparable and permanent injury to any extent; can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for public use." (*Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.)

From the foregoing authorities and observations I summarize the following conclusions: That the state had no authority to do the acts complained of by the plaintiff. It did not assume to act under its power of eminent domain, or if it did, the attempted exercise of that power was unconstitutional because the statute relied upon to authorize it made no provision for compensation for the taking of private property. The supplementary statute, which, by a stretch of language, may be construed as authorizing such compensation, is unavailing because it was not passed until after the commission of the acts described, and it is fundamental that, although payment need not precede the taking, the provision for compensation is an indispensable precedent. Since the state cannot justify the invasion of the plaintiff's property for the purposes described under its police power, or the common-law right of necessity, or the inherent power to make surveys of its civil divisions, it follows that the acts of the defendants committed in excess of the last-mentioned power were unauthorized trespasses, for which the plaintiff is entitled to some relief, and for which some one is liable.

What is the plaintiff's remedy? It is argued by the learned · attorney-general that the statute passed in 1904, and conferring upon the Court of Claims jurisdiction "to hear, audit and determine claims for damages caused by the state engineer and surveyor, and his assistants acting under his direction," in making the surveys authorized by the statute of 1902, clearly relegates the plaintiff to the Court of Claims as the only forum in which he may present his claim, and as clearly deprives him of any other remedy either against the state or against the defendants. The difficulty with this argument is to be found in a subsequent portion of the statute of 1904, not quoted by respondents' counsel. The concluding paragraph of that statute is: "Nothing in this act contained shall be construed as creating or acknowledging any liability on the part of the state." Thus falls the contention that either by the exercise of the right of eminent domain, or by *ex post facto* ratification, the state has assumed and recognized its obligation to pay the plaintiff his damages. The act of 1904 did not create a claim in favor of the plaintiff against the state, any more than section 264 of the Code of Civil Procedure, defining the general jurisdiction of the Court of Claims, undertakes to create claims against the state. In the statute of 1904 the question of the state's liability is distinctly left open.

Since the state cannot be held liable upon any of the theories already discussed, it remains to be ascertained whether it is generally liable for the torts of its officers or agents, or only in special instances expressly created by law. The general rule, as I understand it, is very clearly and forcibly stated in *Poindexter* v. *Greenhow* (114 U. S. 270, 290) in the following language: "The State itself is an ideal person, intangible, invisible, immutable. The government is an agent, and, within the sphere of the agency, a perfect representative; but outside of that it is a lawless usurpation. * * * It is also true, in respect to the State itself, that whatever wrong is attempted in its name is imputable to its government and not to the State, for, as it can speak and act only by law, whatever it does say and do must be lawful. That which, therefore, is

unlawful because made so by the supreme law, the Constitu-
tion of the United States, is not the word or deed of the State,
but is the mere wrong and trespass of those individual persons
who falsely speak and act in its name." No language could
more aptly depict the situation disclosed by this record. The
state, through its Constitution, has ordained that no man's
property shall be taken without due process of law and just
compensation. The state engineer, assuming to act for the
state, and doubtless believing himself authorized to act for it,
has taken and destroyed plaintiff's property without such proc-
ess or compensation. This being contrary to law, it cannot
be the act of the state, and, therefore, must be "the mere
wrong and trespass of those individuals" who . mistakenly
spoke and acted in its name.

The cases which are sometimes referred to as exceptions to
this general rule are not exceptions at all, for they do not fall
within the rule. When a state, by express enactment of stat-
utes, assumes responsibility for such torts of its officers and
agents as are not affected or controlled by the fundamental
law, it makes. a new rule for itself. Instances of that kind
are to be found in *Sipple* v. *State of N. Y.* (99 N. Y. 284),
where the legislature enacted a statute making the state liable
for the negligent operation of its canal locks, upon proof that
would create a legal liability against an individual or a private
corporation, and in *Woodman* v. *State of N. Y.* (127 N. Y.
397), where negligence in the maintenance of a defective canal
bridge was attributed to the state under a similar statute.
There are still other classes of cases in which the state has
been held liable for the apparent torts of its agents, but in
reality for its own neglect of duties assumed under mandatory
or permissive statutes, as in *Ballou* v. *State of N. Y.* (111
N. Y. 500), where the state built a sewer which was per-
mitted to overflow on the plaintiff's premises, and in *Mayor*,
*etc. of N. Y.* v. *Furze* (3 Hill, 612) where the municipality,
which had been empowered to build a sewer, was held liable
for its neglect to properly maintain it.

Thus, by the process of exclusion, we come to the final

question whether the defendants can be held liable as indi-
viduals. If I have thus far reasoned correctly, such liability
seems to follow as a logical necessity. The trespasses com-
mitted upon the plaintiff's land were not the acts of the state,
but the unauthorized and unlawful wrongs of the defendants
who, although the agents of the state within their sphere of
duty, were naked usurpers in assuming to do that which the
state could neither do nor authorize to be done, except in the
exercise of its power of eminent domain; and that power, as
we have seen, was either not attempted to be exercised at all,
or if it was, the effort was fruitless because absolutely void.
If this assumption is correct, it matters not whether the opera-
tions of the defendants upon the plaintiff's land were charac-
terized by reasonable care or gross negligence. The fact that
they were unauthorized is sufficient to confer upon the plain-
tiff a right of action against the defendants. (*St. Peter* v.
*Denison,* 58 N. Y. 416.) The vital principle in all such
cases is that the defendants, though professing to act as
officers of the state, are threatening a violation of the per-
sonal or property rights of the complainant, for which they
are personally and individually liable. This principle was
plainly stated in the opinion of the court in *Poindexter* v.
*Greenhow* (*supra*), as follows : " The case then of the plaintiff
below is reduced to this : He had paid the tax demanded of
him by a lawful tender. The defendant had no authority of
law thereafter to enforce other payment by seizing his prop-
erty. *In doing so he ceased to be an officer of the law and
became a private wrongdoer.* It is the simple case in which
the defendant, a natural private person, has unlawfully, with
force and arms, seized, taken and detained the personal prop-
erty of another." (*In re Ayers,* 123 U. S. 500, 501.) The
principle thus clearly enunciated has been recognized in this
state in *Adsit* v. *Brady* (4 Hill, 631), where a superin-
tendent of repairs on a state canal was personally held liable
for his failure to remove an obstruction to navigation, in con-
sequence of which a canal boat was injured ; and in *Robinson*
v. *Chamberlain* (34 N. Y. 389), where a contractor, who had

been invested with and assumed the powers of a state officer, neglected to properly maintain a lock gate within the area of his contract, causing damage to a boat and its furniture; and in *People* v. *Canal Board* (55 N. Y. 391), where the whole argument in the opinion is predicated upon the proposition "That public bodies and public officers may be restrained by injunction from proceeding in violation of law to the prejudice of the public, or to the injury of individual rights, cannot be questioned."

In the case at bar the complaint and the proofs establish a cause of action against individuals who have mistakenly and unlawfully assumed to act under color of law, so that in its simplest analysis the ultimate question is, whether the plaintiff could maintain this form of action against the defendants if they had professed to enter his premises simply as individuals. As that question can have but one answer, we conclude that the judgment of the courts below should be reversed and a new trial had, with costs to abide the event.

Gray, J. (dissenting).    The facts, which have been stated above, were drawn by the referee from abundant evidence. A great deal of the evidence in the record related to the way in which the work of survey was done, or ought to have been done.    The evidence established, almost beyond reasonable cavil, that the method adopted, of creating a transit, or straight, line from point to point to serve as a base from which the markings and monuments are made, is the best.    It appeared to be in use by the general government, in the work of establishing boundary lines between states and countries, and, also, by other state governments.    At any rate, it is found as a fact, upon the evidence, to have been the way best adapted to the proper performance of the work prescribed by the act.

The evidence as to the result to the plaintiff's park of the acts of the defendants, in prosecuting their work of survey, while, undoubtedly, showing a cutting through the woods, or "scarring" them, as it is called, fails to carry a conviction that the material damage was of any importance.    What dam-

age there was shown, in the felling of trees, was found to have been incidental to the work and necessary under the command of the act. It is clear that the park, as a preserve for animals, or a pleasure to the eye, was not sensibly, or permanently, affected by the defendants' acts. However, the findings of the referee are sufficient upon that subject.

There is no question, here, of the exercise of the police power of the state; nor is there of that of the right of eminent domain. There is, simply, a question of the necessary exercise of governmental powers in delimiting and in establishing boundary lines between political subdivisions of the state; the acts incidental to which, if not open to the charge of negligence, or of unskillfulness, would constitute *damnum absque injuria.* There was no exercise of the police power; for that is predicated upon the necessity of some legislative regulation, having for its object the comfort, safety, health, or welfare, of the citizens. Nor was there an emergency, or some overwhelming necessity, which demanded, and justified, the summary dealing, or interference, with private rights of property. (*Matter of Jacobs*, 98 N. Y. 98, 108.) There was no exercise of the right of eminent domain; because the act, in directing the public work, neither contained any language appropriate to the taking, or condemnation, of private property, nor disclosed an intent that any private property should be taken for the public use. Unless we find, therefore, some authorization in the act to appropriate private property, as, for instance, by its destruction during the prosecution of the work, the right of eminent domain was not exercised. That is something, which is dormant in the state, until legislative action is had, pointing out the occasions, or the modes, or the conditions for the appropriation. (Cooley's Const. Lim. *528.)

Turning to the act, which was passed in 1902 (L. of 1902, chap. 473), we find, in its first section, that it authorizes and directs the state engineer and surveyor " to locate, establish and permanently mark upon the ground " the boundary lines of certain counties mentioned; to file in his office a report of the work done, with a map showing the location,

establishment and permanent marking of the boundary line upon the ground, and to file copies of the map in certain state and county clerks' offices. The rest of the section, merely, provides for the extent to which maps shall be evidence of the location of the boundary lines. The second section appropriates the sum of forty thousand dollars for the purposes of the act, and the third section provides the manner in which the moneys appropriated shall be paid out. It is plain enough from the act that nothing is directed, or contemplated, other than a purely governmental location and establishment of county boundary lines, with marks to make them permanent. What the defendants did was under the authorization of this act and, as it has been before said, their work was carefully and skillfully done; it was done according to the best, if not by the only permanent, method, and there is no charge, nor pretense, of malice. The damage, if it may not be considered as relatively trivial, was consequential and, in such a case, public officers employed in doing the work would not come under liability. (*Radcliff's Executors* v. *Mayor, etc., of Brooklyn*, 4 N. Y. 195, 205, 206; *Atwater* v. *Trustees of Canandaigua*, 124 ib. 602; Cooley's Const. Lim. *542.) It would furnish no ground for arresting the work, upon which the legislature had determined in the interest of the state government. (*Waterloo W. Mfg. Co.* v. *Shanahan*, 128 N. Y. 345, 362.) In *Atwater* v. *Trustees of Canandaigua* (*supra*), the damage claimed was charged to have been caused by the construction of a temporary dam, made necessary in the course of a certain public improvement authorized by law, and it was held, because a temporary structure essential to the making of the public improvements, that no cause of action accrued to the plaintiff. It was observed by Judge BRADLEY, in his opinion, that " serious injury to property may be occasioned by the lawful exercise of powers of a public character pursuant to law, and, if the work is carefully and skillfully performed, the consequences may be *damnum absque injuria, when the legislature has provided for no compensation.*" In this case, what was necessarily done by the

state engineer upon the land of the plaintiff, in order to per-
form the requirements of the legislative act, was not an
appropriation, or taking, of private property, otherwise than
in the felling of trees in order to make the straight, or transit,
line for the location and permanent marking of the boundary
line.    The result was of a temporary nature and effected no
permanent appropriation of property.    It is, doubtless, true,
where a legislative act intends to exercise the sovereign power
in depriving an individual of his property, that it should pro-
vide for compensation to be made; (*Sage* v. *City of Brooklyn*,
89 N. Y. 189; *Matter of Mayor, etc., of N. Y.*, 99 ib. 569,
577), but the act in question had no such intent.    It contained
no provision for compensation for an appropriation; nor was
the state required, in the enactment of the law, to make provi-
sion for compensation, when its power was not to be exercised
in the appropriation of private property.    If, in the execution
of the work, it might happen, as it happened in this case, that
incidental, or temporary, damage should be occasioned to pri-
vate property, that would not characterize what was done under
the act as an exercise of the right of eminent domain.    It has
been held that no constitutional principle is violated by a stat-
ute, which allows private property to be entered upon, and
temporarily occupied, for the purpose of survey and other
incipient proceedings, with a view to judging and determin-
ing whether the public needs require the appropriation and
what the proper location shall be.    A party in such a case
would be bound, neither to make compensation for the tem-
porary possession, nor would he be liable as for a trespass.
(See Cooley's Const. Lim. *560; Sedgwick's Stat. & Const.
Law 467, and cases cited.)

While, therefore, it does not appear how the defendants, as
officers of the state executing a purely governmental duty in
a proper manner, can be restrained by injunction, or can come
under any liability to the plaintiff; nevertheless, if he had a
claim against the state, by reason of damage occasioned to his
property, he was not without a remedy, to be enforced by suit
in the Court of Claims.    In the first place, by an act passed in

the following year, 1903, (L. of 1903, chap. 348), amending the act of 1902, the legislature conferred power upon the state engineer and his assistants to enter upon all lands in the state and to perform any acts necessary to complete their work, " subject to liability only for payment of all damages on account of entry upon such lands and acts done thereon." This amendment operated to ratify the acts of the defendants and assumed liability for any damages occasioned. In the second place, in 1904, (L. of 1904, chap. 561), the legislature conferred jurisdiction upon the Court of Claims " to hear, audit and determine the claims for damages caused by the state engineer and surveyor, and his assistants, acting under his direction," etc.

The conclusions reached, therefore, are that this action cannot be maintained, to restrain the defendants from performing the duty devolved upon them by the act, when performed in the manner described in this case, and the authority of the act was not impaired by the absence of any provision for compensation. If the plaintiff has any claim against the state, for what damage may have been occasioned to his property, under the acts of 1903 and 1904, above mentioned, a tribunal was open to him wherein to prosecute his remedy upon that head.

The judgment should be affirmed, with costs.

Cullen, Ch. J., Edward T. Bartlett and Hiscock, JJ., concur with Werner, J.; Gray, J., reads dissenting opinion; O'Brien, J., absent; Chase, J., not sitting.

Judgment reversed, etc.