### WILLIAMS v. RIVENBURG.

(Supreme Court, Appellate Division, Fourth Department. May 3, 1911.)

1. APPEAL AND ERROR (§ 927*)—REVIEW OF NONSUIT—CONSTRUCTION OF EVIDENCE.

Plaintiff, having been nonsuited, is entitled on appeal to the interpretation of the evidence most favorable to him, though, if the weight of evidence were considered, a conclusion against him might be justified.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3748; Dec. Dig. § 927.*]

2. FOOD (§ 24*)—REGULATIONS—SALE OF CALVES—SEIZURE.

Under Agricultural Law (Consol. Laws 1909, c. 1) § 106, fixing at four weeks the minimum age at which a healthy calf may be sold or exposed for sale for food, and providing that a person duly authorized by the Commissioner of Agriculture may examine a calf exposed for sale, and, if it is "under four weeks of age," may seize and destroy it, there is no justification for doing so when it is of that age and health, though undersized, poorly nurtured, and appearing younger.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 24.*]

3. FOOD (§ 24*)—REGULATIONS—SALE OF CALVES—SEIZURE.

Agricultural Law (Consol. Laws 1909, c. 1) § 106, fixes at four weeks the minimum age at which a healthy calf may be sold or exposed for sale for food, provides that a person exposing for sale or shipping a calf will be presumed to be so exposing or shipping it for food; that a person shipping a calf under four weeks of age for purpose of being raised shall ship it in a crate, unless it is accompanied by its dam; and that a person duly authorized by the Commissioner of Agriculture may examine a calf exposed for sale, or kept with any stock "apparently exposed for sale," and, if it be under four weeks of age, may seize and destroy it. *Held*, that where plaintiff shipped, consigned to himself at stockyards, a lot of calves over four weeks old, and four fresh milch cows, and with each cow its calf from 10 days to two weeks old; and, on their arrival at the yards, the young calves were, though without

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plaintiff's knowledge or authority, separated from the cows, and with the other calves placed in a pen where calves were to be sold and exposed for sale, the commissioner was within his authority in seizing and destroying the young calves; and this though during the day plaintiff told the agent that such calves were to be sold with their dams, and importuned him to let them go; and though the day on which they arrived and were seized was Sunday, which was not a sales day, and on which day the stockyards are prohibited from being open for sales; sales, in fact, being there made on Sunday, as known to the agent.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 24.*]

4. EMINENT DOMAIN (§ 2*)—TAKING FOR PUBLIC USE—COMPENSATION.

Agricultural Law (Consol. Laws 1909, c. 1) § 106, authorizing the seizure and destruction of a calf under four weeks old exposed for sale for food, though providing for no payment for the animal, being enacted under the police power, in the interest of the health of the public, does not contravene the inhibition of the Constitution against taking private property for public use without compensation.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 3–12; Dec. Dig. § 2.*]

5. FOOD (§ 24*)—STATE OFFICERS—AGENTS—LIABILITY.

While an agent of the State Commissioner of Agriculture, when acting strictly within the power given him by Agricultural Law (Consol. Laws 1909, c. 1) § 106, to seize and destroy calves under four weeks of age exposed or apparently exposed for sale for food, is not liable for doing so; he is personally liable where he seizes and destroys one over that age, though on a mistaken belief as to its age.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 24.*]

McLennan, P. J., dissenting in part.

Appeal from Trial Term, Lewis County.

Action by Edward E. Williams against Mervin S. Rivenburg. From a judgment of nonsuit at the close of all the evidence, and from an order denying a motion for new trial, plaintiff appeals. Reversed, and new trial granted.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frank Bowman, for appellant.
A. L. Kellogg, for respondent.

SPRING, J. The action is in conversion to recover damages of the defendant by reason of the killing of five calves owned by the plaintiff, and involves the construction of section 106 of the agricultural law. 1 Consolidated Laws of 1909, c. 1. The defendant is the agent of the State Commissioner of Agriculture, representing that official in the city of New York, and the acts complained of were done by him in pursuance to the general instructions given to him by the head of the department.

The complaint alleges two causes of action, and they will be considered in their order.

1. The plaintiff, a cattle shipper, purchased at Rome, N. Y., and shipped by rail to the Union Stockyards, New York City, on the 27th day of April, 1908, one calf, in company with other calves, all consigned to him. Upon their arrival at the point of destination on the 29th of April, the calves were placed in a pen in the stockyards in

which calves were kept for sale. On April 29th the defendant, in the performance of his duties as an agent of the Commissioner of Agriculture, examined the calves in the stockyards and seized seven on the ground that they were each under four weeks of age, and they were subsequently taken to an abattoir and killed. There were other inspectors with the defendant at the time, and a state veterinary surgeon of wide experience also examined these calves at the stockyard and again after they were killed, and he testified the plaintiff's calf was under four weeks of age, and his testimony was corroborated by all the inspectors. The farmer who raised the calf testified that he was born March 28th, more than four weeks before he was seized by the defendant.

Section 106 of the agricultural law, so far as pertinent to this alleged cause of action, in prohibiting the bringing into a city or village of a calf for the purpose of selling the same, provides:

"Unless it is in a good healthy condition, and no person or persons shall bring any such calf or carcass of the same or any part thereof except the hide into any city, town or village for the purpose of selling, offering or exposing the same for sale, unless the calf is four weeks of age."

And, further, the act provides:

"Any person or persons duly authorized by the Commissioner of Agriculture may examine any calf or veal offered or exposed for sale or kept with any stock of goods apparently exposed for sale and if such calf is under four weeks of age, or the veal is from a calf killed under four weeks of age, or from a calf in an unhealthy condition when killed, he may seize the same and cause it to be destroyed and disposed of in such manner as to make it impossible to be thereafter used for food."

The defendant claims that he was authorized to take and kill the calf by the Commissioner of Agriculture, and his authority to represent that officer is not impugned.

[1] In this case there was a question of fact as to the age of the calf, and, as the plaintiff was nonsuited, he is entitled on this appeal to the interpretation of the evidence most favorable to him. We must start, therefore, with the assumption that the calf was over four weeks of age at the time of its seizure by the defendant. The appearances indicated that it was less than four weeks old. It was undersized. One hip was marked with shears, so that in the event it was appropriated by the state authorities it could be identified and traced to the farmer of whom it was purchased. The flesh was flabby and immature, and, if we were considering the weight of the evidence, we might well be justified in concluding that the calf was under four weeks old in spite of the explicit testimony of the farmer who owned its dam at the time the calf was born.

[2] The statute, however, fixes arbitrarily the minimum age at which a healthy calf may be sold or exposed for sale at four weeks. One calf only three weeks old may be well nourished and fattened and of good size, while another of six weeks of age may be scantily fed, poorly nurtured, undersized, and scrawny. The larger one may be seized in pursuance of the authority given by the statute in question, while the smaller one may be exempt from seizure. It is often necessary in promulgating laws for the benefit of the public health,

or to conserve any other utilitarian purpose, to establish inflexible standards. Milk containing more than 88 per centum of water or fluids comes within the arbitrary definition of adulterated milk. Milk containing 89 per centum of water may be more wholesome in a particular batch than that of another quantity one per centum below the standard. One batch is within the condemnation of the statute, the other not. The fixing of the inflexible standard is the result of tests and examinations extensively made, and is adopted as a fairly just rule for milk generally, although in individual cases the enforcement of the law may occasionally operate unjustly.

No compensation is provided for to the owner of the calf seized, and the seizure is an invasion of his property rights, and can only be supported because the enactment is in the interest of public health and a justifiable police regulation. The exercise of the right must, therefore, be within the letter of the statute. There is no discretion permitted. The inflexible requirement is that the calf offered for sale must be four weeks of age, and, if under that limit, it may be seized. There is no authority to determine the age from the appearance of the animal. The statute does not provide if it is actually or apparently under four weeks of age that it may be seized, but the language is precise, explicit, "under four weeks of age," and the official who seizes a calf in pursuance of the authority of this statute must be certain that the calf comes within its condemnation. The examination made, the appearance of the calf, and other circumstances may be competent in order to fortify the evidence of age, and, if the weight of evidence was reviewable on this appeal, it might not be difficult to decide that the preponderance was with the defendant on that subject.

I think the defendant was not within the compass of his authority in seizing this calf, provided it was over four weeks of age, as we must assume. The Legislature might have vested the authority to seize if the animal is actually or apparently under four weeks of age, and in that event the agent of the Commissioner of Agriculture acting in good faith might be exonerated of liability, even though the calf exceeded the age limit. The power to prescribe when private property may be taken or destroyed without compensation because it is deleterious to public health is lodged with the Legislature, and the courts cannot enlarge the scope of that authority. There is no claim that the calf was unhealthy. It was immature and the flesh flabby and stringy, but it was not diseased. The "good healthy condition" referred to in the statute is a condition apart from that of age and signifies disease or some defect rendering the meat deleterious to the health of persons eating it. The calf was not taken, and the case was not defended on that ground, but because the animal was under four weeks of age. I think the nonsuit as to the first cause of action was error.

[3] 2. The second cause of action grows out of the seizure of four calves by the defendant in the Union Stockyards and which were indisputably under four weeks of age. On the 30th of January, 1909, the plaintiff at Lowville, Lewis county, consigned to himself at the Union Stockyards in New York City 85 or 90 calves and 4 fresh milch cows, and with each cow was its calf, and they were from 10

days to 2 weeks old. When they arrived at the stockyards, all the calves, including these four, were placed in a pen together, and where calves were to be sold and exposed for sale. They arrived on Sunday, and on that day the defendant, with other agents, examined a large number of calves, and among others, seized these four of the plaintiff's, and they were subsequently carted to the slaughterhouse and killed. Section 106 of the agricultural law contains this clause:

"Any person or persons exposing for sale, selling or shipping any calf or carcass of the same will be presumed to be so exposing, selling or shipping the said calf or carcass of the same for food."

The shipment of these calves and herding them with a large number which were to be sold for food established the presumption that these four were to be exposed for sale for a like purpose. The statute empowering the agent of the Commissioner of Agriculture provides that he may examine any calf offered for sale "or kept with any stock of goods apparently exposed for sale," and, if the calf was under four weeks of age, may seize and cause it to be destroyed. The defendant when he found these four immature calves obviously under four weeks of age collected with a large number in a sales pen was called upon to take prompt action, otherwise they might be sold with the others. As they were kept with a stock of calves "apparently exposed for sale," he was within the strict letter of the statute in seizing them as he did.

The plaintiff seeks to find shelter in the clause of the statute which reads that if a calf is shipped "for the purpose of being raised, if said calf is under four weeks of age, shall ship it in a crate, unless said calf is accompanied by its dam." This clause relates to the shipment, and does not apply where the dam and calves after having reached the shipping destination are separated, and the calves are put in with a large number of others which are to be sold for food. The plaintiff was not present when this separation was made. The defendant, however, was in the line of his duty to prevent the sale of the calves under the prescribed age, and he was not called upon to ascertain the motives which induced the collection of these calves in the sales pen, or whether they were placed there by the authority of the plaintiff. The agent was confronted with a condition requiring the exercise of his authority, and he was warranted from what he saw in seizing these animals for destruction. That evening the plaintiff came to the stockyards, and, after informing the agent that the calves were to be sold with their dams, importuned him to let them go to their mothers. The defendant did not see fit to rely upon the statements of the plaintiff to overcome the presumption arising from the herding of these calves in a pen where calves for sale were accustomed to be gathered, as the defendant knew. In this determination he exercised his discretion upon the facts and circumstances as they were presented to him, and which justified the course he pursued.

Sunday was not sales day, and the plaintiff claims for that reason the calves were not exposed for sale. The evidence shows that, while the stockyards are prohibited from being open for sales on that day, sales in fact were made on Sunday to butchers and others known to

the men in charge of the stockyards. The defendant was not obliged to remain there until after midnight in order to keep track of these calves. Long experience in the examination of calves and other animals at these stockyards made him cognizant of the practices prevailing and the necessity for prompt decision and action in order to prevent the sale of animals within the condemnation of the law. I think the court was right in granting the nonsuit as to this cause of action.

3. There is no allegation in the complaint and no claim that the defendant in seizing these calves to be destroyed acted maliciously or in bad faith. He was endeavoring to perform his official duties honestly and fairly, as he understood them. The complaint is an ordinary action in conversion, charging that the defendant "wrongfully and unlawfully and without any right or authority seized" and converted the said property, and in the second cause of action the damage claimed is to the milch cows which were alleged to be of less value because the calves, their offspring, had been taken from them. In so far as the seizure by the defendant was within the letter of the statute, he is not personally liable to an action for damages.

[4] Laws enacted in pursuance of police power to abate nuisances or to benefit the health of the public which may result in the destruction of private property, and which do not provide for any payment therefor to the owner, are not violative of the constitutional inhibition against taking private property for a public use without compensation. Health Department v. Rector, etc., 145 N. Y. 32, 43, 39 N. E. 833, 27 L. R. A. 710, 45 Am. St. Rep. 579; Mugler v. Kansas, 132 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Lawton et al. v. Steele, 119 N. Y. 226, 23 N. E. 878, 7 L. R. A. 134, 16 Am. St. Rep. 813. The abatement of a nuisance or its regulation is within the scope of legislative authority, and we would not expect the act in terms to authorize the annihilation of property. In effectuating the primary purpose of the power conferred to get rid of the nuisance or offense against public health, private property may be incidentally destroyed or its value impaired, and yet it is not an appropriation in the sense of infringing upon the constitutional guaranty assuring immunity to the owner of property against its taking for a public use.

[5] Before an officer can justify any such invasion of private property, the legislative authority must be clear and unequivocal, and he must keep strictly within the power conferred. People ex rel. Copcutt v. Board of Health, 140 N. Y. 1, 35 N. E. 320, 23 L. R. A. 481, 37 Am. St. Rep. 522; Underwood v. Green, 42 N. Y. 140; Miller v. Horton, 152 Mass. 540, 26 N. E. 100, 10 L. R. A. 116, 23 Am. St. Rep. 850; Litchfield v. Bond, 186 N. Y. 66, 74, 78 N. E. 719; Lowe v. Conroy, 120 Wis. 151, 97 N. W. 942, 66 L. R. A. 907, 102 Am. St. Rep. 983.

In the first case cited, the board of health of the city of Yonkers passed an ordinance declaring certain dams within the municipality nuisances, and directing their abatement. Their authority was challenged, and it developed, in fact, that the dams were not nuisances, and the board's actions were reviewed by certiorari. The court in considering the finality of the determination of the board used this ex-

pressive language at page 8 of 140 N. Y., page 322 of 35 N. E. (23 L. R. A. 481, 37 Am. St. Rep. 522):

"It may be said that, if the determination of a board of health as to a nuisance be not final and conclusive, then the members of the board, and all persons acting under their authority in abating the alleged nuisance, act at their peril; and so they do, and no other view of the law would give adequate protection to private rights. They should not destroy property as a nuisance unless they know it to be such, and, if there be any doubt whether it be a nuisance or not, the board should proceed by action to restrain or abate the nuisance, and thus have the protection of a judgment for what it may do."

In the state of Massachusetts there was a statute in force authorizing the summary killing of an animal afflicted with the glanders or farcy, and there was no provision for compensation to the owner. The Commissioners on Contagious Diseases of Animals examined, or caused to be examined, a horse owned by the plaintiff and decided the animal was afflicted with this contagious disease, condemned it, and formally recited the facts in a written notice to the board of health of the village where the owner of the horse lived, and directed the owner "to cause it to be killed forthwith," which was done. Subsequent investigation disclosed that the horse was not afflicted with the glanders, and the members of the board were held individually liable for the value of the horse killed. Miller v. Horton, 152 Mass. 540, 26 N. E. 100, 10 L. R. A. 116, 23 Am. St. Rep. 850, supra.

There is a wide divergence in the authorities of the various state jurisdictions on this question, many holding that the officials are not liable individually or in their official capacity for errors of judgment of the kind stated. The weight of authority, however, seems to be the other way. I therefore think that in directing the killing of the calf, which the evidence most favorably viewed for the plaintiff shows was over four weeks of age, the defendant exceeded his authority and is individually liable for the value thereof, and the nonsuit was error.

The judgment and order should be reversed.

Judgment and order reversed, and new trial granted, with costs to the appellant to abide event. All concur, except McLENNAN, P. J., who dissents in an opinion.

McLENNAN, P. J. (dissenting). I agree with the majority of the court in holding that a nonsuit was properly granted as to the second cause of action alleged in the complaint for the reasons stated in the opinion of Justice SPRING, but I dissent from the holding that the trial court improperly granted a nonsuit as to the first alleged cause of action, because, in my opinion, the defendant incurred no individual liability for the acts done by him in the premises, and so notwithstanding upon the evidence it was a question of fact as to whether the calf seized by defendant and killed was more than four weeks of age. The defendant at the time he seized such calf was not an officer of the state. He was the mere agent of the Commissioner of Agriculture, and whatever he did in the premises was done under the direction and under instructions given him by the commissioner. Under such circumstances, I think the defendant was not personally liable for such acts, but that, if the plaintiff had a cause of action because of the al-

leged illegal seizure of his calf, the action should have been brought directly against the Commissioner of Agriculture or in the Court of Claims against the state. Wright v. Eldred, 46 Hun, 12, affirmed 137 N. Y. 556, 33 N. E. 337; Shaver v. Eldred, 114 N. Y. 236, 21 N. E. 411. In the Wright Case, supra, the action was brought to recover for injury to the plaintiff's premises, alleged to have been caused by the act of the defendant in setting water back on to them. The defendant attempted to justify his action by producing a letter written by the assistant superintendent and approved by the superintendent of public works, authorizing him to do the acts complained of, and it was held that the defendant was not personally liable for the acts thus done by him. Judge Bradley, in writing the opinion of the General Term, at the bottom of page 17 of 46 Hun, summed up the whole matter as follows:

"The defendant did no more, and he may be deemed to have legitimately acted under the authority and direction of the superintendent of public works, and therefore incurred no personal liability."

One of the earliest cases bearing upon this subject is Waggoner v. Jermaine, 7 Hill, 357. The headnote in that case is as follows:

"The canal commissioners, under the act for the construction of the Crooked Lake Canal, caused surveys, etc., to be made, and then adopted a plan as required by the act, preliminary to commencing the work; but the plan had no reference to the defendants' dam, standing at the outlet of the lake. Afterward. however, the commissioners, by way of substitute for certain regulating gates contemplated by the plan, permitted the defendants to increase the height of their dam 10 inches in order to effect the same object for which the gates were designed; and thereby the plaintiff's lands lying above the dam were injured. Held, that no action lay against the defendants for the injury; they having acted under the authority of the commissioners."

The case of Litchfield v. Bond, 186 N. Y. 66, 78 N. E. 719, cited by appellant's counsel, is not in conflict with the cases above cited. That action was brought directly against the state engineer and surveyor and officers of the state, and it was held, in effect, that the state could not commit a trespass, and, the action of its officers being contrary to law, they were responsible individually. To the same effect is Robinson v. Chamberlain, 34 N. Y. 389, 90 Am. Dec. 713.

But in the case at bar the Commissioner of Agriculture was the public officer and the defendant his mere agent, and acting solely, as the evidence shows, under his employment and direction, and he did solely and only as he was directed. This is uncontradicted in the case. Hence the defendant was not liable, and the action, if a cause of action existed in plaintiff's favor, should have been brought directly against the Commissioner of Agriculture. Unless compelled so to do by authority, we ought not to hold that a mere agent, employed by and acting directly under the authority, employment, and direction of the Commissioner of Agriculture, a public officer charged with the duty of the enforcement of the pure food laws, so called, is personally liable for acts done by him in carrying out such directions. Such rule, if adopted, would make it extremely difficult to procure agents who would carry out his instructions if, in case the instructions were wrong, such agent was personally liable for acts done in pursuance thereof.

In the case at bar all reasonable means were taken to ascertain whether or not the calf in question was under four weeks of age. The witness Hulbert,. who was plaintiff's agent in purchasing the calf and who claimed to have marked this calf, testified on cross-examination:

"I marked the calf because it was a light calf, and I though it might be seized in New York."

Another witness called by the plaintiff and in his employ, testified:

"I marked whatever calves were marked because they were small, and because I was afraid they would be seized in New York."

Another witness called by the plaintiff testified:

"The calf was a small dark calf. * * * From his appearance I should think the calf was about three weeks old."

The defendant testified that the calf was under four weeks old. One of defendant's witnesses, Harry D. Gill, one of the state veterinarians, and a man of great skill and experience, testified "the calf was under three weeks of age." Inspector Clark stated that the calf was under four weeks of age.

Having the opinions of all these witnesses, the defendant seized the calf and caused it to be killed, as it was his duty to do, under the directions given him by the Commissioner of Agriculture. If under such circumstances the inspector, the defendant in this case, must permit such calf to be sold as food in the city of New York, or take the responsibility of having a personal action brought against him for a tort in case the assertion of the plaintiff or of some other witness is believed by a jury that the calf was more than four weeks of age, we may not expect such inspector to take the chances of such a litigation against him, but he will allow the citizens of New York City to continue to eat bob veal.

The judgment appealed from should be affirmed, with costs.