[No. 31539.   Department One.   August 23, 1951.]

R. J. STREETER, *Respondent*, v. WILLIAM VAUGHAN *et al.*,
*Defendants*, R. A. REEVE, *Appellant.*[1]

*Loomis Baldrey* and *Samuel W. Peach*, for appellant.

*Abrams, McCush & Rinker*, for respondent.

[1]Reported in 235 P. (2d) 193.

DONWORTH, J.—Plaintiff brought suit against William Vaughan and his wife and R. A. Reeve to recover damages sustained by plaintiff in the purchase of a herd of cattle from Vaughan allegedly induced by defendants' false representations that they were free of Bang's disease.

The case was tried before a jury. At the close of plaintiff's evidence, the court sustained the challenge of Vaughan and wife to the sufficiency of the evidence, and they were dismissed from the action. A similar challenge on behalf of defendant Reeve was denied, and the trial proceeded against him as sole defendant.

After both parties had rested, defendant Reeve renewed his challenge to the sufficiency of the evidence, and this was likewise denied by the court. The jury returned a verdict in favor of the plaintiff in the amount of sixteen hundred ten dollars. Judgment in this amount against defendant Reeve was entered by the court, from which he has appealed.

The case was submitted to the jury on two theories, fraud and negligence. The principal ground upon which appellant relies on this appeal is that there was not sufficient competent evidence to justify the submission of the case to the jury on either theory.

The evidence was not seriously in conflict as to the facts material to our decision. The transactions involved in this controversy took place between Thursday, November 20, 1947, and Wednesday, November 26, 1947. Respondent owned and operated a dairy farm in Skagit county, on which he had a herd of nine cows, which were free of Bang's disease. He desired to purchase additional cattle, and, through one Chase, a cattle dealer, he learned that defendant Vaughan had twenty-five cows and a bull for sale. Respondent's testimony regarding the purchase of this herd is as follows:

"A. I went to Mr. Vaughan's farm at Everson with Mr. Chase, a cattle dealer, I think that was on the evening of the 20th of November, 1947, and Mr. Chase said he had the herd of cattle for sale, twenty-five head and a bull, and we saw Mr. Vaughan at the barn and he said they were for sale; that he wanted $5000.00 for the herd, I believe, and I asked

him if they were clear of Bang's disease. He said yes, they were, but I told him I wanted a test on them because the State was in my community testing at the time and that is the test I had to take, and I mentioned my veterinarian there, Dr. Clinton, I would bring him up and have him take a test on them, and Mr. Chase spoke up about Dr. Reeve at Everson was closer and he could run a test on them, so I said Okeh, I would pay for the test, because I want a clean herd. I had a clean herd. So we agreed then to have Dr. Reeve test them, and Mr. Chase and I stopped on the way home and he went to the house and talked to Dr. Reeve about it, and then they called me on the porch and I asked him if he would test them for me and I would pay him for it, and he said yes, Saturday, about noon."

Respondent took delivery of the cattle (except the bull) in three installments—one load on Saturday afternoon and two on Sunday. He gave Vaughan a check for five thousand dollars in payment for the cattle and paid Chase one hundred fifty dollars for hauling them from Vaughan's farm to his own.

Appellant, who is a licensed veterinarian of some thirty-five years experience, took blood samples from the Vaughan cattle on Friday morning for the purpose of testing them for Bang's disease. He sent one half of each sample to a private laboratory in Bellingham and the other half to the state laboratory in Puyallup. He received the report from the private laboratory Friday evening. This report showed two head "suspect" and twenty-four head clear. According to respondent, on Saturday morning appellant told Chase over the telephone that the herd was free of Bang's disease.

The testimony of respondent, of Chase, and of appellant, regarding this alleged false representation is set forth as follows:

Respondent's testimony:

"Q. Now, what was the next you heard from Mr. Vaughan, Dr. Reeve, or Mr. Chase concerning the cattle? A. About Saturday noon, Mr. Chase called and said they were all clear, and said we could start hauling that day, so I went up Saturday afternoon after the first load. Q. Where did Mr. Chase tell you he had acquired that information that they were all clear? A. He said Dr. Reeve had called him. Q.

Dr. Reeve had called him and advised that they tested all clear? A. Yes. MR. BALDREY: Object to that as being hearsay. THE COURT: Overruled."

On direct examination, Dr. Reeve testified as follows:

"Q. Did you communicate the result of this quick test to Mr. Streeter or Mr. Chase? A. I did, to Mr. Chase. Q. Exactly what did you tell him? A. I told him that the herd was clean of Bangs reactors, but there was two suspects in there, from the reaction of these animals that had been vaccinated, I figured. Q. When did you tell him that? A. That was—well, that was the advice—that was on the next Wednesday, when I was down on his place, if I remember right. Q. When did you have your first conversation with Mr. Chase, after you received the test from Dr. McKenzie? A. That was on a Wednesday. Q. That was on a Wednesday? A. When I was down to the plant, inspecting. Q. You had— I don't mean conversation in person. Did you communicate with him in any way before that Wednesday? A. Not to the best of my knowledge, no. Q. Did you have a telephone conversation with him? A. Not—only on a Saturday, as he called up. Q. Well, that is what I am wanting you to tell about. What was that conversation? A. Well, that was conversation in regard to this herd. Q. When was that? A. That was on a Saturday. Q. What date? A. Well, Friday, that would be the 22nd. It was on a Saturday. Friday would be the 21st; it would be the 22nd. Q. You made the test on the 21st, and on the 22nd, you phoned Mr. Chase? A. No. He called me. Q. What was that conversation? A. Well, my conversation was that, as far as I could ascertain through this test, that the animals were free. There was two suspects, due, I figured, from vaccination. The rest were clean, only the two that were suspects, were from vaccination."

Chase, who was acting as respondent's agent and whose testimony is particularly pertinent because he was the actual source of respondent's information, gave the following testimony:

"Q. Did you have any conversation at any time concerning any suspects? A. Dr. Reeve told me on the phone in regards to these cattle that there was a suspect, or two suspects, I don't recall just what it was, but they was vaccinated cattle and he figured it was due to vaccination that showed suspect. Q. When was that? A. I believe it was on Saturday morning, following the purchase of the cattle. I

believe it was Saturday morning. Q. On Thursday, you made the first visit up there; is that right? A .That's right. Q. And on Friday, Dr. Reeve took the test, as far as you know? A. As far as I know. He was to take the test next morning. Q. And on Saturday, he notified you as to the result of the test? A. Well, I believe it was Saturday morning, either Friday night or Saturday morning. I believe it was Saturday morning. Q. And you got some of the cattle Friday night, did you? , A. No sir. We got them Saturday night. . . . Q. (By Mr. Baldrey) When did you receive information from Dr. Reeve there was a suspect? A. He told me Saturday morning there was one or so that showed suspect."

When cross-examined by respondent's counsel, Chase became somewhat confused, as appears from the following testimony:

"Q. Now, I just have one or two questions, Mr. Chase: I want to get clear in my mind on what occasions you saw Dr. Reeve in connection with this transaction. My recollection, from your testimony, and you correct me if this is wrong, was on Thursday, you and Mr. Streeter stopped to see him, and that he drew the blood on Friday, and then he called you on Saturday morning and said they were all clear; is that correct? A. Yes. Q. And then you testified that, Saturday, after the purchase of the cattle, in talking to him over the phone, he advised you there were some suspects, but he thought they were just vaccinated cattle; is that the correct sequence? A. Well, he said the cattle were clear, but there were two suspects, but, in his opinion, they were due to vaccination because, evidently, they must have been young cattle or identified as having been vaccinated cattle. . . . Q. Wasn't that conversation on Saturday a week after you took delivery of the cattle? A. Not as I recall. Q. You are certain of that? A. Well, not exactly. Q. You are not just certain as to what date that conversation came up with Dr. Reeve, are you? A. Well, as I recall it, he transferred that message to me the Saturday morning when we took them, that the cattle were all clear."

The testimony of respondent as to what his agent told him is patently incompetent as hearsay and should have been excluded. The competent evidence on the issue does not bear out respondent's contention that appellant told Chase, before the sale, that the cattle were all clear. On the

contrary, it shows without contradiction that appellant, on Saturday morning before the sale, told Chase that the cattle were all clear except for two "suspects," and that in his opinion the "suspects" were vaccinated cattle.

Appellant, on Saturday, also mailed to Chase a statement certifying that the private laboratory had found the Vaughan cattle free of Bang's disease. However, this was not received by Chase until Monday, and respondent had meanwhile removed the cattle to his own farm and placed them in contact with his own herd.

On Monday (November 24), Dr. Reeve received the report of the state laboratory test. This was delivered to Chase on Wednesday. This report showed three "suspects" and one "reactor" (which meant that one cow definitely had Bang's disease and three others possibly had it). At that time, the Vaughan cattle had been on respondent's farm in contact with his own cattle for four days.

On Tuesday (November 25), respondent had the Vaughan cattle tested by his own veterinarian, Dr. Clinton, who sent blood samples to the state laboratory. This report showed five "suspects" and three "reactors". As a result, Dr. Clinton quarantined the herd.

Bang's disease is one of the most contagious diseases to which cattle are subject. One infected cow can easily infect an entire herd. It takes from one month to three months after exposure before the disease can be detected by the usual tests. Dr. Clinton testified that, after the Vaughan cattle had been commingled with respondent's original herd for four days, it was too late to separate the two herds and prevent the spread of the disease.

Diseased animals may be sold as beef cattle, but their value as breeding stock or dairy cattle is lost. As a result of the presence of Bang's disease in the Vaughan cattle, respondent was compelled to dispose of thirteen cows (three of them from his original herd) and was put to the expense of disinfecting his premises.

Some six months after appellant tested the Vaughan cattle, respondent paid his bill for professional services amounting to fifteen dollars.

Appellant relies upon eight assignments of error, but, in view of the conclusion which we have reached, it is necessary to consider only one; namely, that the trial court erred in denying appellant's motion for nonsuit at the close of all the evidence.

The third amended complaint upon which the case was tried charged defendants Vaughan and wife with making certain fraudulent representations to respondent which induced the sale of the cattle. The only allegation of wrongful conduct on appellant's part was that he was engaged to test the Vaughan cattle for Bang's disease and that he falsely caused respondent to be advised that the cattle were free from the disease.

In order to have the case submitted to the jury on the issue of fraud, it was incumbent upon respondent to produce clear, cogent and convincing evidence tending to show that appellant made a false representation to that effect.

We have quoted above the testimony of appellant, respondent and respondent's agent, which testimony, viewed in the light most favorable to respondent, wholly fails to establish any fraudulent representation. On the contrary, it shows that appellant relied on the report of the private laboratory, which showed that the cattle were all "clear" except two "suspects," and as to the latter expressed the opinion that they had been vaccinated against the disease and for that reason showed on the report as "suspect." Appellant's basis for expressing this opinion is shown by his testimony as follows:

"Q. What does that show as the result of the examination? A. It shows there is two suspects. Q. What does that mean? A. Well, to the best of my knowledge, it shows that there is a slight reaction to Bang's disease, a slight infection in these animals. Q. You have done vaccination, have you? A. I have. Q. What is the practice in vaccination, and what is the purpose, and what do you do when you vaccinate? . . . A. It causes reaction by the injection of vaccine into the blood stream of the animal. Q. What is that vaccine that is injected into the animal? A. Well, sir, I couldn't state that, because I am not a laboratory man. It is a strain that has been put out by the Government, known as No. 19, which I

understand carries an organism which causes these reactions. Now, that has been my knowledge, as far as my knowledge goes. Q. Does it produce the same kind of reaction when a sample is taken as the disease, itself? A. As far as I know. Q. To a lesser degree, or a greater degree? A. Well, if it is taken directly after, we will say thirty days or two months after this animal has been injected, as a rule you get a positive reaction. That has been my experience. Q. Later, what do you get? A. You will get a suspect, and it has been proven that those animals will become clean in a course of time. . . . Q. Is the reaction from Bangs disease, or from a vaccination which produces an effect resembling Bangs disease? A. This here, to the best of my knowledge, is from vaccination, this reaction we have got here on this paper. Q. You didn't answer the question. I asked is the reaction from vaccination, reaction from Bangs disease, or from something resembling Bangs disease? A. I don't understand. Q. If you get a reaction from vaccination, does it resemble Bangs disease? A. Well, of course, from the information we get here, we can't tell, but the idea is: why is vaccine used? So they will not contract the disease. In that respect, it would naturally lead you to believe that they were not affected with the real contagious abortion, because, if they were, why, if you vaccinate all these calves, that they wouldn't spread it all over the place? Now, I may be wrong, but that has been my impression."

Appellant knew that six of the cows in the Vaughan herd had been acquired from one Honcoop, a dairyman, with whose operation he was familiar. He was cross-examined as to the basis for his belief that the two suspects were vaccinated cattle as follows:

"Q. Several questions, Doctor. Do you do Mr. Honcoop's work, the individual that Mr. Vaughan bought the herd from? A. I have, at times, but I haven't lately. Q. Did you ever vaccinate these specific cattle? A. No, I didn't. Q. You just heard they had been vaccinated? A. Well, I have been up to his farm and I have saw cattle that had been vaccinated. They come into the slaughterhouse with the vaccination tags. Q. There were six Honcoop animals, you understand, were purchased by Mr. Vaughan? A. Yes. Q. Can you take your statement that you have worked out here that was given to Dr. McKenzie, and designate those six? A. No, I can't designate them, only just two, from what Mr. Vaughan told me, that they were from this herd. Q. That

the Honcoop animals were vaccinated? A. Yes, because one of them, that had the tag, and that was told to me before there was any test put in there, when he was talking about the cattle and where he got them. Q. Can you take this report and pick out the Honcoop animals from it? A. No, only those two. Q. Can you take this report and pick out for me the animals that had lost ear tags at the time you made the tests? A. I might be able to. I don't know. Q. Either identity or vaccination tags? A. I couldn't say until I look it over. Q. All right. How much of this sort of thing were you doing in 1947 and 1948? A. Drawing blood from animals for Bangs test, quite a considerable. I was doing a considerable amount, yes."

▉ Appellant's statement that he thought that the two cows were reported "suspect" because they had been vaccinated may have been erroneous professional advice, but there is no showing that appellant acted fraudulently in the sense that he knew that this opinion was false. Appellant expressed his professional opinion, which, in the light of subsequent tests of the cattle, was proven to be wrong. This does not constitute actionable fraud.

As this court pointed out in *Grant v. Huschke*, 74 Wash. 257, 133 Pac. 447:

"Representations as to mere matters of opinion are usually not actionable at all. In order to be actionable they must be made, not only under circumstances clearly entitling the adverse party to rely upon them as true and with the actual intent that he shall so rely, but with conscious knowledge on the part of the person making them that they are false. The fraud consists in representing as his opinion that which is not his opinion. In such a case there must be an actual intent to defraud, and this must be proved by positive evidence. On the other hand, where the representations are as to pure matters of fact and made under circumstances entitling the adverse party to rely upon them as true, then the fact that they are false raises a legal presumption of fraudulent intent. The question of fraud thus becomes in such cases a question of law for the court, not a question of fact for the jury. In *Northwestern Steamship Co. v. Dexter Horton & Co.*, 29 Wash. 565, 70 Pac. 59, we find the same situation presented."

Nothing that occurred after Sunday (November 23rd) has any bearing on this case, because respondent, on that day, completed the transportation of the Vaughan cattle to his own farm and placed them in the same pasture with his own herd. The damage was already done at that time.

Under the evidence presented in this record, the trial court erred in submitting the issue of fraud to the jury.

Appellant complains because the trial court submitted the case to the jury on the additional theory that appellant could be found liable for negligence or malpractice.

There was no allegation in the third amended complaint charging appellant with negligence or malpractice. Neither was there any evidence that appellant did not possess that degree of skill ordinarily possessed by veterinarians of good standing practicing in the same locality. Respondent did not introduce any evidence as to what degree of skill was required of a veterinarian in Whatcom or Skagit counties, employed by a dairy farmer to test cattle to ascertain whether they were infected with Bang's disease. The burden to produce such evidence was upon respondent.

We find no sufficient evidence of fraud on the part of appellant and no sufficient evidence of negligence committed by him to warrant the submission of the case to the jury on either theory. The trial court, therefore, erred in denying appellant's challenge to the sufficiency of the evidence made at the close of the trial.

The judgment entered upon the verdict is reversed, with instruction to dismiss the action.

SCHWELLENBACH, C. J., BEALS, HILL, and FINLEY, JJ., concur.