OPINION OF THE COURT
Gerard M. Weisberg, J.
In this action for veterinary malpractice, we must decide whether the “locality rule” extant in other professions applies to veterinarians as well as whether CPLR 2306 and 4518 (c) are applicable to animal hospitals. In addition, we must resolve whether the public interest in avoiding the delay or cancellation of horse races at a major metropolitan racetrack justifies a State veterinarian in abandoning treatment of an injured animal and, if so, whether just compensation must then be paid to the animal’s owners for the resulting destruction of its value.
Claimants’ three-year-old thoroughbred filly, Tiki Singh, was scheduled to run at Aqueduct Race Track in Queens, New York, on November 13, 1983. Pursuant to the rules of the New York State Racing and Wagering Board (Board), all horses entered in races at New York tracks must have their blood chemically analyzed prior to race time in order to check for illegal drugs or medicines. On the day in question, Dr. Allan J. Ahearne, a veterinarian employed by the Board, was visiting the stalls of the 25 to 30 horses scheduled to participate that afternoon in order to perform the blood tests. The normal procedure was to insert a vacutainer needle laterally into the jugular vein of each horse and draw out sufficient blood for analysis.
Between 7:30 and 8:00 a.m., Dr. Ahearne appeared at Tiki *351 Singh’s stall. After verifying her identification tattoo number, one of claimants’ grooms, Luis. Alvarez, held Tiki Singh’s halter and the doctor inserted the líá-to-2-inch needle into her jugular vein. For no apparent reason, the needle broke off. Dr. Ahearne testified at his deposition, introduced into evidence, that he could feel it under the horse’s hide in or next to her vein. However, since he had no surgical equipment with him and had to complete the other blood tests, he circled the spot where the needle was lodged with a green marking pen and told the groom to arrange for another veterinarian to treat her. It was not until several hours later that Dr. James Brewer was able to see Tiki Singh. He examined her but was unable to locate the broken needle. He therefore arranged for her to be transported to the University of Pennsylvania, School of Veterinary Medicine, Widener Hospital, on or about December 1, 1983. When the horse was X-rayed, the needle was located in an inoperable area of her lungs. Tiki Singh has never raced again. She was put out to pasture and eventually taken in satisfaction of outstanding feed bills.
The gravamen of claimants’ cause of action is that Dr. Ahearne had a duty and responsibility to either remove the broken needle or arrange for another veterinarian to treat Tiki Singh before he left the stall and the needle fragment migrated. Defendants respond that there was insufficient proof that the horse X-rayed at the University of Pennsylvania was Tiki Singh or, alternatively, that Dr. Ahearne departed from good and accepted veterinary practice at New York racetracks. In addition, defendants submitted affirmative proof that as the track veterinarian he was strictly prohibited from treating Tiki Singh, nor could he remain with her because he had to complete the remaining prerace blood tests.
With respect to the identity of the injured filly, claimants offered the medical records and X rays taken at Widener Hospital. These showed that a three-year-old thoroughbred filly named Tiki Singh was admitted on December 1, 1983 and was found to have a needle lodged in her lungs. A certification of correctness by the business manager of the hospital also accompanied the X rays,[1] and defendants conceded that the written records were an accurate copy of whatever was on file *352 at the hospital. Moreover, claimants produced two veterinarians, Dr. James M. Brewer and Dr. Carol McLeod, who had both worked and studied at Widener Hospital, and who testified to the reputation and general record-keeping procedures at that institution. They also stated that the offered documents and X rays were of the type regularly kept there in the regular course of its business and practice.
Defendants objected to their introduction on the grounds that an insufficient foundation had been laid under CPLR 4518 (a) and that CPLR 4518 (c) was inapplicable inasmuch as this was a veterinary hospital. We find, however, that they are admissible under either subdivision.
CPLR 4518 (a) provides that records are admissible as proof of their contents provided: (1) they are made in the regular course of business, (2) at or about the time of the event recorded, or a reasonable time thereafter, and (3) that such enterprise regularly makes such records.
Claimants’ experts clearly established the third element of this test. In addition, they testified that a file in the form of those offered in evidence would be set up for the animal and entries made on the dates indicated. Based thereon and that the records were on Widener Hospital forms and certified by such institution or conceded as correct, we find they were made in the ordinary course of business and at or about the time of treatment. They are therefore admissible in accordance with CPLR 4518 (a). (See also, Proposed NY Code of Evidence § 803 [24] [1980].)
Moreover, pursuant to CPLR 2306 and 4518 (c), hospital records, including X rays, certified as correct, are admissible without any further foundation. (Matter of Quinton A., 68 AD2d 394, revd on other grounds 49 NY2d 328.) Defendants object to the applicability of these provisions on the basis that the term "hospital” is defined in section 2801 of the Public Health Law as a place for the treatment of human diseases. We reject that interpretation for both technical and policy reasons. First, because article 28 of the Public Health Law is concerned with the regulation and licensing of human hospitals in New York State, not the admissibility of evidence in civil trials. Therefore, not surprisingly, such definition is not incorporated by reference into CPLR 2306 or 4518. Second, the same salutary benefits achieved by allowing certified hospital *353 records into evidence without further foundation would be served by construing the term hospital to include those for the care and treatment of animals.
The predecessor statute to CPLR 2306 was Code of Civil Procedure § 867-a (added by L 1915, ch 325) which provided, in language almost identical to CPLR 2306, that certified copies of public hospital records could be produced in response to a subpoena without a hospital employee needing to appear. In 1929 this was broadened to include the records of all hospitals (see, L 1929, ch 339) and thereafter to include the records of municipalities and the State. (See, L 1936, ch 741; L 1957, ch 866; see also, Civ Prac Act § 412.) The reason for the rule was that these institutions produced records in the regular course of their duties and it was an unwarranted inconvenience to compel the appearance of an employee to state this obvious proposition. (See, 1957 NY Legis Ann, at 44.) Inasmuch as a "hospital” was traditionally defined as a "specialized hotel where the sick or infirm in body or mind may be treated” (Daly’s Astoria Sanatorium v Blair, 161 Misc 716, 719), and animal hospitals treat infirm animals and keep records in the regular course of their business, it would be an unwarranted inconvenience to require that they send an employee to so state. We therefore cannot hold that the Legislature intended to exclude "veterinary hospital” from the general term "hospital” as stated in CPLR 2306. (See also, Joyce v Kowalcewski, 80 AD2d 27 [out-of-State hospital records voluntarily produced within CPLR 2306 and 4518 (c)].)[2]
Ultimately, defendants’ real objection is to what they consider to be insufficient verification that the horse examined and X-rayed at the University of Pennsylvania was Tiki Singh, noting that her identification tattoo number was omitted from the records. The answer is that once a foundation has been established under CPLR 4518 (a) or (c) the records are admissible and prima facie proof of their contents. The burden of proving them false shifts to the other side (Matter of Quinton A., 68 AD2d 394, revd on other grounds 49 NY2d 328, supra), which defendant could have attempted to do by sub *354 poenaing the production of Tiki Singh and having her reexamined. Moreover, defendants’ speculation that the records were not Tiki Singh’s is incredible.
Every horse which races at United States tracks has a unique registered name and identification number tattooed on his or her lip. Here, the defendants’ veterinarian admitted that he broke oíf a needle in Tiki Singh’s throat and could not remove it. A three-year-old filly thoroughbred under the name of Tiki Singh was then sent to the University of Pennsylvania and X-rayed there and found to have a needle in its lungs and no one under Tiki Singh’s name or identification number has raced since then. Defendants’ apparent theory that claimants have kept the horse from further racing while substituting another thoroughbred with a needle in its lungs leaves us incredulous. We therefore hold the records and X rays admissible and find that the injured animal is in fact Tiki Singh.
With respect to the appropriate standard of care which Dr. Ahearne owed Tiki Singh, claimants’ expert, Dr. Carol McLeod, testified that it is a breach of good and accepted veterinary practice anywhere to just abandon an animal in Tiki Singh’s condition without either removing the needle fragment or clamping it to keep it from migrating. The State argues that the "locality rule” existing in medical malpractice actions should also apply to veterinarians, to wit, that he owed the same duty of care as other veterinarians at New York State racetracks. (See, Schrempf v State of New York, 66 NY2d 289.) Inasmuch as claimants’ expert’s experience was confined to Delaware, Pennsylvania and New Jersey racetracks, defendants posit that there was a failure of proof on this issue.
We disagree for two reasons. First, assuming arguendo the locality rule applies to veterinarians (cf., Boom v Reed, 69 Hun 426, 428 [veterinarian must use "reasonable and ordinary care and diligence” without regard to locality]), it was designed to protect small town physicians from charges that they failed to exercise big city expertise which they reasonably would not have. (See, Toth v Community Hosp., 22 NY2d 255.) However, where a defendant is part of a professional community, he or she is bound by the possibly higher standards notwithstanding such association extends beyond the defendant’s geographic locality or even State lines. (Riley v Wieman, 137 AD2d 309.) We take judicial notice that numerous major racetracks are being operated throughout the State of New York. (See, Fisch, New York Evidence § 1050.) In the *355 absence of any evidence that the level of expertise being practiced by veterinarians at these facilities is less than that existing at racetracks in Pennsylvania, Delaware and New Jersey, we decline to apply a lesser standard. (See, Hall v Yonkers Professional Hosp., 115 AD2d 637.)
Moreover, where the “very nature of the acts complained of bespeaks improper treatment and malpractice” a prima facie case may be established without the necessity of offering expert evidence to that effect. (Hammer v Rosen, 7 NY2d 376, 380; see, 530 E. 89 Corp. v Unger, 43 NY2d 776.) We think this is such a case. No expert is needed to explain that a veterinarian does not abandon a stricken animal without making satisfactory arrangements for its care. Case law has held so (see, e.g., Boom v Reed, 69 Hun 426, supra; Annotation, Veterinarian’s Liability for Malpractice, 71 ALR4th 811) as well as the regulations governing the conduct of veterinarians. (8 NYCRR 29.6 [a] [8].)[3]
Here, Dr. Ahearne broke a needle off in Tiki Singh’s throat and he could feel it under her hide. Rather than removing it himself or waiting with her until another veterinarian or surgical equipment could arrive, he left the animal with a groom resulting in the migration of the needle into her lungs and the destruction of her career. Prima facie this is unreasonable and unprofessional conduct.
In response, defendant called Dr. Charles E. Short, a veterinarian licensed in Tennessee but who had been exclusively teaching anesthesiology since 1967 at two New York veterinary and nonveterinary medical schools. Dr. Short opined that as a track veterinarian, Dr. Ahearne was ethically prohibited from operating on Tiki Singh and, therefore, reasonably carried no surgical equipment with him as he conducted the blood tests.
With respect to leaving the horse to complete his rounds, Dr. Short was of the view that this required Dr. Ahearne to weigh the risks to Tiki Singh against the inconvenience to the public that possibly delaying the races would entail. Inasmuch as it was a mere error in professional judgment, according to defendants, no liability obtains.
*356 While mere errors in choice between conflicting acceptable alternative treatments are not actionable (Schrempf v State of New York, 66 NY2d 289, supra), all alternatives weighed must be in the best interests of the patient. Here, that was not the case. The decision whether or not to treat Tiki Singh was not based on her best interests but on whether the public interest in having the races start on time outweighed her health.
From the point of view of tort liability, we find this decision unreasonable and inhumane. It has been said that the greatness of a Nation can be judged by the way its animals are treated. The potential for serious consequences to Tiki Singh should have been obvious to Dr. Ahearne. Moreover, the races were not scheduled to start until the afternoon and the possibility of a delay does not seem too great a price to pay to avoid jeopardizing a thoroughbred’s life or career. There appears to be no reason why the doctor could not have, for example, sent for a hemostat to clamp the needle in place, keeping it from migrating until another veterinarian would have been able to remove it. To argue that as a track veterinarian Dr. Ahearne was ethically prohibited from treating Tiki Singh misses the point: having created the condition, the duty to correct it arose. Having failed to honor that duty, for whatever reason, results in liability.
Alternatively, assuming arguendo that the public interest in having the races start on time sufficiently outweighed defendants’ obligations to Tiki Singh, the consequence is that claimants’ property was invaded and rendered worthless for the common good. That is a de facto taking requiring compensation under the 5th Amendment of the US Constitution and article I, § 7 of the NY Constitution. (See, Loretto v Teleprompter Manhattan CATV Corp., 458 US 419; Birnbaum v State of New York, 73 NY2d 638; O'Brien v City of Syracuse, 54 NY2d 353; Keystone Assocs. v State of New York, 39 AD2d 176, affd on opn below 33 NY2d 848; see also, Andrus v Allard, 444 US 51; Sentell v New Orleans R. R. Co., 166 US 698; Seawall Assocs. v City of New York, 74 NY2d 92; Williams v Rivenburg, 145 App Div 93; Williamsburg Candy & Tobacco v State of New York, 106 Misc 2d 728; Lowe v Conroy, 120 Wis 151, 97 NW 942.) Thus, we find the State liable under either a theory of veterinary malpractice or, accepting defendants’ position, as a de facto taking.
With respect to damages, claimants’ expert, Charles J. Lowry, is a horse auctioneer and appraiser. Based on his review of Tiki Singh’s racing record from her first outing on *357 July 14, 1982 until her last on November 5, 1983, he opined that she had a fair market value of $60,000 to $70,000 on the date of the accident. Mr. Lowry explained that a race horse’s value is based primarily on its projected winnings, which is itself a function of past performance. Over her 114-year racing career, Tiki Singh had one win and several second and third place finishes, earning over $50,000 in the aggregate. This placed her in the top 12% to 15% of the race horse population. Since most thoroughbreds race for about six years, Tiki Singh would have been expected to have competed at least another three years achieving similar or higher earnings. In addition, as a New York bred filly, she was eligible for races with richer purses than non-New York bred fillies.
Defendants argue that this opinion is entitled to no weight because it was not supported by comparable sales. While it might have been better practice to submit such information, there is no hard and fast rule that they must be presented in every case. It is only "take it” or "leave it” opinions without any corroborative or objective support in the record that are objectionable. (See, 2641 Concourse Co. v City Univ., 137 Misc 2d 802, affd on opn below 147 AD2d 379.) Provided the factual basis and criteria underlying the opinion is contained in the evidence, or fairly inferable therefrom, it is admissible. (Tarlowe v Metropolitan Ski Slopes, 28 NY2d 410.)
Here, the evidence showed that Tiki Singh earned over $50,000 in 114 years and probably would have earned at least as much for three or more years thereafter. That in itself supports the opinion that a willing buyer would reasonably have paid $60,000 to $70,000 for her in 1983.
In conclusion, we find the defendants guilty of veterinary malpractice in the handling of Tiki Singh or, to the extent that they reasonably put the public interest above her care, that they effectuated a de facto taking. In either case, she was rendered worthless and claimants are entitled to damages therefor as follows:
Value of Tiki Singh on Nov. 13, 1983 $65,000.00
Guard service 832.00
Transportation to and from University of Pennsylvania 660.05
Medical expense at University of Pennsylvania 311.84
Total: $66,803.89
together with statutory interest from November 13, 1983 until *358 May 13, 1984 and from August 31, 1984 until the date of this decision. (See, Court of Claims Act § 19 [1].) Inasmuch as the claim was tried under a theory of veterinary malpractice, we do not reach the issue of the applicability of EDPL 702 (c).
As a final point, the Board exists only as part of the State’s Executive Department and has no independent existence. (See, Racing, Pari-Mutuel Wagering and Breeding Law § 101.) It is therefore an improper defendant, the State being the real party in interest. (Dunckley v State of New York, 136 Misc 2d 767; Tillot v New York State Thruway Auth., 107 Misc 2d 229.) The foregoing damages are awarded with respect to the State and the claim against the Board is dismissed.

. Photographically inscribed on the X rays was the name of the horse, the date when taken, an identification number and the name and address of the veterinarian under whose supervision they were taken. (Cf., CPLR 4532-a [1].) Inasmuch as the affidavit requirement (see, CPLR 4532-a [3]) was not complied with, we do not reach the question of this section’s applicability to *352 this nonpersonal injury, property damage case. (Cf., Hoffman v City of New York, 141 Misc 2d 893.)

. CPLR 2306 is not technically a rule of evidence. However, inasmuch as it excuses various institutions from producing a live witness to testify with respect to its records, a traditional business record foundation cannot be established. The practice developed, therefore, that certified copies were admissible without further foundation. In 1970, CPLR 4518 (c) was added which did no more than codify this procedure. (5 Weinstein-Korn-Miller, NY Civ Prac f 4518.26.)

. Section 29.6 (a) provides in pertinent part:
"Unprofessional conduct in the practice of veterinary medicine * * * include[s] * * *
"(8) abandoning or neglecting an animal patient under and in need of immediate care, without making reasonable arrangements for the continuation of such care”.