NO. 4-06-0330          Filed: 12/15/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| BRIAN LOMAN and JACK DODD, | ) | Appeal from |
| Plaintiffs-Appellants, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DAVID E. FREEMAN, MVB, | ) | No. 03L112 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Michael Q. Jones, |
| | ) | Judge Presiding. |

---

JUSTICE APPLETON delivered the opinion of the court:

Plaintiffs, Brian Loman and Jack Dodd, sued defendant, David E. Freeman, a veterinarian, for performing an unauthorized surgery on their horse. The amended complaint has two counts, the first count entitled "Negligence" and the second entitled "Conversion." The trial court concluded that the Moorman doctrine barred the first count (Moorman Manufacturing Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443 (1982)) and that the second count failed to state the elements of conversion. We find that both counts state a cause of action in tort. Therefore we reverse the dismissal of the amended complaint and remand this case for further proceedings.

I. BACKGROUND

Here are the allegations common to both counts of the amended complaint. Plaintiffs owned a racehorse. Defendant "held himself out as a veterinarian, qualified to practice veterinary medicine in *** Illinois." In late May and early June 2001, plaintiffs entrusted the

horse to him for care and treatment, giving him permission to perform two procedures: (1) "surgery on the left carp[a]l bone" and (2) "draining fluid from the right stifle." Plaintiffs specifically forbade him to "perform surgery on the right stifle[,] because surgery on the right stifle [was] very risky and should not be performed until the horse [was] lame." In violation of that express prohibition, defendant performed surgery on the right stifle, ruining the horse for future racing. He performed this surgery at the University of Illinois veterinary teaching hospital in Urbana.

In count I, sounding in negligence, plaintiffs alleged that defendant owed them a duty to "render care and treatment for [their] horse in compliance with the standards of a qualified veterinarian." By performing the unauthorized surgery, defendant "breached a duty imposed on him independent[ly] of any possible [s]tate *** employment[,] in that [he] breached a duty which any veterinarian owe[d] to the owners of any animals treated by their veterinarian." Specifically, plaintiffs alleged he was negligent in three ways: (1) failing to obey plaintiffs' instructions on the scope of surgery, (2) performing unnecessary surgery, and (3) performing surgery that violated the standard of care of a veterinarian. For damages, they sought "the difference between the [fair market value] of the property immediately before the occurrence and its [fair market value] immediately after the occurrence." Because the injury to the right stifle was irreparable and permanently incapacitated the horse from racing, the horse was reduced to "salvage value." Before the surgery, the horse was worth over $50,000.

In count II, sounding in conversion, plaintiffs alleged that the unauthorized surgery "constitute[d] an unauthorized assumption of the right to possession or ownership of the horse." Demanding the return of the horse in its unaltered condition would have been futile because the

harm to the right stifle was irreversible and rendered the horse incapable of racing ever again. Plaintiffs repeated their allegation that defendant breached a duty independent of state employment, a duty that any veterinarian owed to the owners of an animal brought in for treatment.

Defendant filed a hybrid motion to dismiss the amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2004)). In the part of the motion corresponding to section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2004)), defendant argued that the Moorman doctrine barred the tort action in count I because the surgery was not "a sudden and dangerous occurrence" and plaintiffs sought merely economic damages. See Moorman, 91 Ill. 2d at 86, 435 N.E.2d at 450. In the part of the motion corresponding to section 2-615 (735 ILCS 5/2-615 (West 2004)), he argued that plaintiffs failed to plead a cause of action for conversion because they did not allege he had "permanently deprived them of possession of the horse." The trial court granted defendant's motion, dismissing the amended complaint with prejudice and striking the case.

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

By invoking the Moorman doctrine, defendant did not raise "other affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2-619(a)(9) (West 2004)). Rather, he argued that plaintiffs failed to plead a cause of action in tort, given the supreme court's description of a "tort" in Moorman. See First Midwest Bank, N.A. v. Stewart Title Guaranty Co., 355 Ill. App. 3d 546, 561, 823 N.E.2d 168, 181 (2005), aff'd, 218 Ill. 2d 326, 843 N.E.2d 327 (2006); Rutkoski v. Hollis, 235 Ill. App. 3d 744, 747, 600 N.E.2d 1284, 1287 (1992); Bagel v.

American Honda Motor Co., 132 Ill. App. 3d 82, 86-87, 477 N.E.2d 54, 58 (1985). In substance, defendant's motion to dismiss is not a hybrid motion pursuant to section 2-619.1 (735 ILCS 5/2-619.1 (West 2004)) but solely a motion to dismiss pursuant to section 2-615 (735 ILCS 5/2-615 (West 2004)) for failure to state a cause of action. We will treat it as such. See Landers-Scelfo v. Corporate Office Systems, Inc., 356 Ill. App. 3d 1060, 1065, 827 N.E.2d 1051, 1057 (2005) (the substance of a motion, not its label, determines what it is).

Our standard of review is de novo. Morris v. Williams, 359 Ill. App. 3d 383, 386, 834 N.E.2d 622, 626 (2005). Taking the well-pleaded facts in the amended complaint as true and construing them in a light most favorable to plaintiffs (see Valstad v. Cipriano, 357 Ill. App. 3d 905, 913, 828 N.E.2d 854, 865 (2005)), we ask whether those facts state a cause of action, that is, whether they entitle plaintiffs to relief under the law (see Morris, 359 Ill. App. 3d at 386, 834 N.E.2d at 626).

### B. Our Subject-Matter Jurisdiction

Defendant has filed a motion to dismiss this appeal for lack of subject-matter jurisdiction. He cites sections 8(b) and (d) of the Court of Claims Act, which give the Court of Claims exclusive jurisdiction over "[a]ll claims against the [s]tate founded upon any contract entered into with the [s]tate of Illinois" (705 ILCS 505/8(b) (West 2004)) and over "[a]ll claims against the [s]tate for damages in cases sounding in tort *** and all like claims sounding in tort against *** the [b]oard of [t]rustees of the University of Illinois" (705 ILCS 505/8(d) (West 2004)).

The following facts emerge from the affidavits attached to defendant's motion. In May and June 2001, he was a professor at the College of Veterinary Medicine of the University of

- 4 -

Illinois, and he performed research and trained students by operating on animals in the large-animal clinic. Thus, when operating on plaintiffs' horse, he was doing his job as a professor. He was not in private practice at the time. He did not even have a veterinary license because, as a professor at a state university, he was exempt from the Veterinary Medicine and Surgery Practice Act of 1994 (Veterinary Practice Act) (225 ILCS 115/1 through 28 (West 2000)). See 225 ILCS 115/4(3) (West 2000). He has no malpractice insurance and has not been a privately practicing veterinarian since 1973. Through its self-insurance program, the university will indemnify him for any liability he incurs as a result of acting within the scope of his duties as a professor.

Plaintiffs argue that defendant owed them a duty, independent of his state employment, to competently perform veterinary medicine. They liken defendant to state-employed physicians and other professionals, whom sovereign immunity does not protect insomuch as they have a duty to conform to a professional standard of care independent of their governmental position. See, e.g., Jinkins v. Lee, 209 Ill. 2d 320, 334, 807 N.E.2d 411, 420 (2004); Janes v. Albergo, 254 Ill. App. 3d 951, 964, 626 N.E.2d 1127, 1136 (1993); Madden v. Kuehn, 56 Ill. App. 3d 997, 1000-01, 372 N.E.2d 1131, 1133 (1978).

In Jinkins, 209 Ill. 2d at 340, 807 N.E.2d at 423, for example, the supreme court held that sovereign immunity did not bar a wrongful-death lawsuit against professional employees of a mental-health-care facility operated by the state. In that case, George Jinkins was drinking heavily and threatening to kill himself and others. Jinkins, 209 Ill. 2d at 321, 807 N.E.2d at 413. His mother and a social worker signed a petition to have him involuntarily admitted. Jinkins, 209 Ill. 2d at 323, 807 N.E.2d at 413-14. The intake psychiatrist, Choong Lee, declined to certify George for involuntary admission into the state facility. Jinkins, 209 Ill. 2d at 326, 807 N.E.2d at

415. Instead, he and a licensed clinical professional counselor, Paulette Medlin, referred George to a community health center for outpatient treatment. Jinkins, 209 Ill. 2d at 326, 807 N.E.2d at 415. Soon after George returned home, he shot himself. Jinkins, 209 Ill. 2d at 326, 807 N.E.2d at 415. His surviving spouse sued Lee and Medlin for professional negligence. Jinkins, 209 Ill. 2d at 327-28, 807 N.E.2d at 416. The trial court granted summary judgment in the defendants' favor on the ground of sovereign immunity. Jinkins, 209 Ill. 2d at 328, 807 N.E.2d at 416. Because "the duty owed to George by Dr. Lee and by Medlin arose independent[ly] of their state employment," the appellate court held that sovereign immunity did not bar the lawsuit. Jinkins, 209 Ill. 2d at 328, 807 N.E.2d at 416. The supreme court agreed. Jinkins, 209 Ill. 2d at 340, 807 N.E.2d at 423.

The supreme court held that "[t]he determination of whether an action [was] an action against the state," for purposes of sovereign immunity, "depend[ed] on the issues raised and the relief sought." Jinkins, 209 Ill. 2d at 330, 807 N.E.2d at 417. As to "the issues raised," an action was an action against the state only if all three of the following propositions were true:

> " ' "(1) [there were] no allegations that an agent or employee of the
> [s]tate acted beyond the scope of his authority through wrongful
> acts[,] (2) the duty alleged to have been breached was not owed to
> the public generally independent of the fact of [s]tate employ-
> ment[,] and (3) where the complained-of actions involve[d] matters
> ordinarily within that employee's normal and official functions of
> the [s]tate ***." ' " Jinkins, 209 Ill. 2d at 330, 807 N.E.2d at 418,
> quoting Healy v. Vaupel, 133 Ill. 2d 295, 309, 549 N.E.2d 1240,

1247 (1990), quoting Robb v. Sutton, 147 Ill. App. 3d 710, 716,

498 N.E.2d 267, 272 (1986).

If all three of those propositions were true, that ended the inquiry; the lawsuit was essentially against the state, and sovereign immunity barred it.  If the court found one or more of those propositions to be untrue, the inquiry proceeded to "the relief sought":  the court then had to "consider whether the relief sought [was] such that 'a judgment for the plaintiff could operate to control the actions of the [s]tate or subject it to liability.'"  Jinkins, 209 Ill. 2d at 330, 807 N.E.2d at 418, quoting Currie v. Lao, 148 Ill. 2d 151, 158, 592 N.E.2d 977, 980 (1992).

The plaintiff in Jinkins never alleged that the defendants acted outside the scope of their authority as a psychiatrist and a licensed clinical professional counselor.  (Deciding whether a patient should be involuntarily admitted or, alternatively, referred for treatment as an outpatient was a matter ordinarily within their normal and official functions as employees of the state mental-health facility.)  Instead, the dispute was over the source of their duty, the second of the three factors in Robb:  "whether the duty allegedly breached was *** owed to the public generally[,] independent of the fact of state employment."  Jinkins, 209 Ill. 2d at 331, 807 N.E.2d at 418.

But for the defendants' employment at the state facility, they would have never encountered George.  Jinkins, 209 Ill. 2d at 333, 807 N.E.2d at 420.  The question, however, was not whether their state employment provided the occasion for their incurring a duty toward him, but where that duty ultimately came from.  Jinkins, 209 Ill. 2d at 333-34, 807 N.E.2d at 420.  The supreme court held that "[b]ecause Dr. Lee and Medlin were using their professional judgment in evaluating George, the source of their duty was their mental[-]health[-]professional status" rather than their state employment.  Jinkins, 209 Ill. 2d at 335, 807 N.E.2d at 420.  Lee "was not

- 7 -

performing a uniquely governmental function"; the standards for involuntary admission were the same at private and public hospitals. Jinkins, 209 Ill. 2d at 335, 807 N.E.2d at 421. Regardless of a physician's employment status, he or she had a duty to "exercise the same degree of knowledge, skill, and care which a reasonably well[-]qualified physician in the same or similar community would use under similar circumstances." Jinkins, 209 Ill. 2d at 336, 807 N.E.2d at 421. This duty of the physician toward the patient "emanate[d] from the standards imposed by the profession itself" rather than solely from the state employment. Jinkins, 209 Ill. 2d at 336, 807 N.E.2d at 421; see also Currie, 148 Ill. 2d at 160, 592 N.E.2d at 981 ("sovereign immunity attaches only when a [s]tate employee is charged with breaching a duty imposed on him solely by virtue of his [s]tate employment" (emphasis added)).

Having determined that the source of the defendants' duty to George was independent of their state employment, the supreme court turned its attention to "the relief sought." Jinkins, 209 Ill. 2d at 336, 807 N.E.2d at 421. "[T]he relief sought" consisted of two considerations (which perhaps overlapped to some extent): whether a judgment in the plaintiff's favor could operate to (1) control the actions of the state or (2) subject it to liability. Jinkins, 209 Ill. 2d at 330, 807 N.E.2d at 418. As to the first consideration, state law already required "both state and private institutions to devote resources and fashion policy to adhere to the standard of care." Jinkins, 209 Ill. 2d at 337, 807 N.E.2d at 421, citing 20 ILCS 1705/4.1 (West 1996). Because the plaintiff merely alleged that the defendants had "failed to abide by their respective professional standards of care," a judgment for the plaintiff would not operate to control the actions of the state--which already had a policy of following the standard of care. Jinkins, 209 Ill. 2d at 337, 807 N.E.2d at 422. Although the state would pay the judgment, as required by the

State Employee Indemnification Act (5 ILCS 350/2(d) (West 2002)), case law made a distinction between liability, which triggered sovereign immunity, and indemnification, which did not. Jinkins, 209 Ill. 2d at 336 n.2, 807 N.E.2d at 421 n.2, citing Janes, 254 Ill. App. 3d at 965-66, 626 N.E.2d at 1136-37, and Kiersch v. Ogena, 230 Ill. App. 3d 57, 63-64, 595 N.E.2d 696, 701 (1992).

In assessing our own subject-matter jurisdiction, we will follow the path of the supreme court in Jinkins. First, we will consider "the issues raised." See Jinkins, 209 Ill. 2d at 330, 807 N.E.2d at 418. In their amended complaint, plaintiffs claim that defendant performed an unauthorized and unnecessary surgery and, in doing so, breached the professional standards of a veterinarian--not merely the standards of a veterinarian employed by the university, but those of any veterinarian. Both our legislature and our supreme court have recognized the existence of a standard of care applicable to veterinarians. In Massa v. Department of Registration & Education, 116 Ill. 2d 376, 378-79, 507 N.E.2d 814, 814-15 (1987), the Department of Registration and Education (Department) revoked Maynard L. Massa's license to practice veterinary medicine on the ground that he committed "gross malpractice" in his treatment of a dog. Under section 12(14) of the Veterinary Practice Act, the Department could revoke a veterinarian's license for "gross malpractice." Ill. Rev. Stat. 1981, ch. 111, par. 6913(14). The veterinary examining committee found "a glaringly obvious deviation from an acceptable standard of veterinary care" (Massa, 116 Ill. 2d at 384, 507 N.E.2d at 817)--a finding the supreme court held to be "not against the manifest weight of the evidence" (Massa, 116 Ill. 2d at 385, 507 N.E.2d at 818).

Traditionally, at common law, the term "malpractice" applied to physicians and attorneys but not to veterinarians. Southall v. Gabel, 28 Ohio App. 2d 295, 298, 277 N.E.2d 230,

- 9 -

232 (1971); J. Young, <u>Toward a More Equitable Approach to Causation in Veterinary Malpractice Actions</u>, 16 Hastings Women's L. J. 201, 209 (2005); Black's Law Dictionary 978 (8th ed. 2004) (definition of "malpractice").  "Through judicial rule and the adoption of legislation over the last [50] years or more, there has been an expansion of the concept of malpractice to include veterinarians."  16 Hastings Women's L. J. at 209.  Our legislature's use of the word "malpractice," in the Veterinary Practice Act, presupposes a set of professional standards applicable to all veterinarians.  "Malpractice" is "[a]n instance of negligence or incompetence on the part of a professional."  Black's Law Dictionary 978 (8th ed. 2004).  A "professional" is a member of "a learned profession."  Black's Law Dictionary 1246 (8th ed. 2004).  A learned profession implies the existence of a body of learning relevant to that profession as a whole--the "standard of care" to which the veterinary examining committee referred in <u>Massa</u>.  Presumably, this body of learning is what the faculty teaches at the College of Veterinary Medicine.  When deciding whether the case at hand fits into "a general class of cases of which the court has jurisdiction," we "accept as true all well[-]pleaded facts and reasonable inferences drawn therefrom."  <u>Skinner v. Mahomet Seymour School District No. 3</u>, 90 Ill. App. 3d 655, 656-57, 413 N.E.2d 507, 508 (1980).  According to the amended complaint, one of the tenets of veterinary medicine is that before performing a nonemergency surgery on an animal, the veterinarian must obtain the owner's consent to that surgery.  We accept that allegation as true.  See M. Nunalee & G. Weedon, <u>Modern Trends in Veterinary Malpractice:  How Our Evolving Attitudes Toward Non-Human Animals Will Change Veterinary Medicine</u>, Animal L. 125, 150 (2004) (article cowritten by a lawyer and a veterinarian, stating that "[v]eterinarians must always remain mindful of client communication.  Effective client communication includes securing informed consent from the

client before performing a procedure").

Even though (taking the factual allegations of the amended complaint to be true) the veterinary standard of care required a veterinarian to obtain consent to a particular surgery before performing it, did the veterinarian in this case--a professor at a state university--owe that duty to plaintiffs apart from his state employment, considering that the Veterinary Practice Act did not apply to him?  See 225 ILCS 115/4(3) (West 2000).  A veterinarian licensed to practice in Illinois owes an obligation to the state regulatory agency, the Department of Professional Regulation, to adhere to the veterinary standard of care on pain of losing his or her license.  225 ILCS 115/1, 25(E), 25(F), 25(O) (West 2000); see also 16 Hastings Women's L. J. at 203 ("Veterinarians have an obligation to the state in which they practice.  This duty arises by virtue of the enforcement and licensing powers of state agencies").  Defendant, however, is exempt from the Veterinary Practice Act and may practice veterinary medicine without a license.  See 225 ILCS 115/4(3) (West 2000).  Therefore the statute, being inapplicable to him, cannot serve as his independent source of duty for purposes of sovereign immunity.

What, then, was defendant's independent source of duty toward plaintiffs? Numerous jurisdictions in this country recognize a standard of care applicable to veterinarians under the common law.  Turner v. Sinha, 65 Ohio App. 3d 30, 35, 582 N.E.2d 1018, 1021 (1989); Berres v. Anderson, 561 N.W.2d 919, 924-25 (Minn. App. 1997); Williamson v. Prida, 75 Cal. App. 4th 1417, 1425-26, 89 Cal. Rptr. 2d 868, 872 (1999); Restrepo v. State of New York, 146 Misc. 2d 349, 354, 550 N.Y.S.2d 536, 541 (N.Y. Ct. Cl. 1989); Fackler v. Genetzky, 263 Neb. 68, 71, 638 N.W.2d 521, 526-27 (2002); Zimmerman v. Robertson, 259 Mont. 105, 108, 854 P.2d 338, 340 (1993); Price v. Brown, 545 Pa. 216, 223, 680 A.2d 1149, 1152-53

(1996); Kerbow v. Bell, 259 P.2d 317, 319 (Okla. 1953); Turner v. Benhart, 527 So. 2d 717, 718-19 (Ala. 1988); Ruden v. Hansen, 206 N.W.2d 713, 715 (Iowa 1973); Williams v. Reynolds, 45 N.C. App. 655, 659-60, 263 S.E.2d 853, 856 (1980); Limpert v. Bail, 447 N.W.2d 48, 51 (S.D. 1999); Downing v. Gully, 915 S.W.2d 181, 185 (Tex. App. 1996); Posnien v. Rogers, 533 P.2d 120, 121 (Utah 1975); Brockett v. Abbe, 3 Conn. Cir. Ct. 12, 15-16, 206 A.2d 447, 449 (1964); Folsom v. Barnett, 306 S.W.2d 832, 832 (Ky. App. 1957); Dyess v. Caraway, 190 So. 2d 666, 668 (La. App. 1966); Williams v. Gilman, 71 Me. 21, 22-23 (1880); Streeter v. Vaughan, 39 Wn.2d 225, 234, 235 P.2d 193, 198 (1951). We are aware of two Illinois cases that assume, for the purpose of their analysis of other issues, that a veterinarian can be held liable for negligent treatment of an animal; but these cases do not specifically discuss the standard of care. Jankoski v. Preiser Animal Hospital, Ltd., 157 Ill. App. 3d 818, 821, 510 N.E.2d 1084, 1087 (1987); Nikolic v. Seidenberg, 242 Ill. App. 3d 96, 102, 610 N.E.2d 177, 181 (1993). We have found another Illinois case in which "[t]he trial court and both parties consider[ed] that the body of law developed in medical malpractice applie[d] also in [a] veterinarian negligence action"; because the parties were in agreement on that proposition, the appellate court had no occasion for examining it. Spilotro v. Hugi, 93 Ill. App. 3d 837, 841, 417 N.E.2d 1066, 1069-70 (1981).

Section 299A of the Restatement (Second) of Torts provides as follows:

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowl- edge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of

- 12 -

Torts §299A, at 73 (1965), cited in <u>Advincula v. United Blood</u>

<u>Services</u>, 176 Ill. 2d 1, 23, 678 N.E.2d 1009, 1020 (1996), and

<u>Purtill v. Hess</u>, 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872 (1986).

We hold that when someone undertakes to render veterinary services, the common law imposes upon that person a duty to use the same skill and knowledge normally possessed by veterinarians in good standing in similar communities, unless that person represented he or she had greater or less skill or knowledge. See J. King, <u>The Standard of Care for Veterinarians in Medical Malpractice Claims</u>, 58 Tenn. L. Rev. 1, 16 (1990) ("Veterinary[-]malpractice cases involving allegations of negligent treatment have generally followed the lead of the medical [-]malpractice cases in approving a standard of care based on professionally[ ] developed standards of practice"). Defendant's duty to plaintiffs did not arise solely from his state employment. His job at the university was incidental, merely providing the occasion for his incurring a duty toward them. See <u>Jinkins</u>, 209 Ill. 2d at 332-33, 807 N.E.2d at 419-20. When operating on plaintiffs' horse, he "was not performing a uniquely governmental function." <u>Jinkins</u>, 209 Ill. 2d at 335, 807 N.E.2d at 421; <u>Currie</u>, 148 Ill. 2d at 162, 592 N.E.2d at 981. He was performing a professional service that was subject to a well-developed standard of care applicable to all veterinarians, whether they were in private or public employment. According to the amended complaint, an ordinarily competent veterinarian is trained to perform only those nonemergency surgeries to which the owner has consented, and performing an unauthorized surgery is unworkmanlike.

Having determined that defendant owed plaintiffs a duty under the common law--a duty independent of his state employment--we turn our attention to "the relief sought." See

Jinkins, 209 Ill. 2d at 336, 807 N.E.2d at 421. We do not see how a judgment against defendant would operate to control the state. Surely the College of Veterinary Medicine does not have a policy of performing unauthorized surgeries. The judgment, in itself, would not subject the state to liability. The state would indemnify defendant, but indemnification is different from direct liability. "[T]he decision of [the university] to indemnify its employees does not deprive the circuit courts of subject-matter jurisdiction over claims otherwise properly brought in the circuit court." Kiersch, 230 Ill. App. 3d at 64, 595 N.E.2d at 701; see also Jinkins v. Lee, 337 Ill. App. 3d 403, 416, 785 N.E.2d 914, 925 (2003), aff'd, 209 Ill. 2d 320, 807 N.E.2d 411; Janes, 254 Ill. App. 3d at 965-66, 626 N.E.2d at 1136-37; Bartholomew v. Crockett, 131 Ill. App. 3d 456, 463, 475 N.E.2d 1035, 1040 (1985).

In summary, we find, in our de novo review, that plaintiffs have alleged the breach of a duty that the common law imposed upon defendant independently of his state employment. Therefore the circuit court had subject-matter jurisdiction--as do we--and we deny defendant's motion to dismiss this appeal.

### C. The Moorman Doctrine

In Moorman, 91 Ill. 2d at 73, 435 N.E.2d at 445, the plaintiff bought a steel tank from the defendant for storing grain. A crack developed in the tank, and the plaintiff sued the defendant in tort. Moorman, 91 Ill. 2d at 73, 435 N.E.2d at 445. The supreme court held that the plaintiff had to pursue its remedies under a theory of contract rather than tort. "When the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery." Moorman, 91 Ill. 2d at 88, 435 N.E.2d at 451.

- 14 -

Another name for the <u>Moorman</u> doctrine is the economic-loss doctrine. "Economic loss" means "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property.'" <u>Moorman</u>, 91 Ill. 2d at 82, 435 N.E.2d at 449, quoting Note, <u>Economic Loss in Products Liability Jurisprudence</u>, 66 Colum. L. Rev. 917, 918 (1966). The term also includes "'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" <u>Moorman</u>, 91 Ill. 2d at 82, 435 N.E.2d at 449, quoting Comment, <u>Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages--Tort or Contract?</u> 114 U. Pa. L. Rev. 539, 541 (1966). In contrast to a contractual claim, which alleges only economic damages or disappointed commercial expectations, a tort claim alleges the infliction of personal injury or property damage by a sudden or dangerous occurrence (<u>Moorman</u>, 91 Ill. 2d at 86, 435 N.E.2d at 450)--"property damage" meaning damage to property other than the defective product itself (<u>Trans States Airlines v. Pratt & Whitney Canada, Inc.</u>, 177 Ill. 2d 21, 42, 682 N.E.2d 45, 54-55 (1997)).

In <u>Anderson Electric, Inc. v. Ledbetter Erection Corp.</u>, 115 Ill. 2d 146, 503 N.E.2d 246 (1986), the supreme court extended the <u>Moorman</u> doctrine to the provision of services. Anderson Electric, Inc. (Anderson), sued two defendants in a two-count complaint. Count I was against Ledbetter Erection Corporation (Ledbetter) for breach of contract; count II was against C-E Walther, Inc. (Walther), for negligence. <u>Anderson</u>, 115 Ill. 2d at 147, 503 N.E.2d at 246. The trial court dismissed count II for failure to state a cause of action in tort, and Anderson appealed under Rule 304(a) (87 Ill. 2d R. 304(a)). <u>Anderson</u>, 115 Ill. 2d at 147, 503 N.E.2d at 246.

In count II of its complaint, Anderson alleged it had entered into a contract with Ledbetter to perform electrical work on precipitator units manufactured by Walther and to be installed in a power plant. Anderson, 115 Ill. 2d at 148, 503 N.E.2d at 247. Ledbetter and Walther in turn had a contract, in which Walther promised to inspect Anderson's work and inform Ledbetter of any deviations from the specifications so that corrections could be made. Anderson, 115 Ill. 2d at 148, 503 N.E.2d at 247. Anderson itself had no contractual relationship with Walther. Anderson, 115 Ill. 2d at 148, 503 N.E.2d at 247. Anderson's theory, in count II, was that Walther undertook a duty to supervise and inspect Anderson's work and that Walther negligently performed that duty by requiring much of the work to be redone for no good reason, causing Anderson to incur unnecessary additional costs. Anderson, 115 Ill. 2d at 148-49, 503 N.E.2d at 247.

The supreme court affirmed the dismissal of count II on the ground of the Moorman doctrine. It held:

"A plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract.

The additional costs Anderson incurred in redoing its work were purely economic losses; they arose solely from disappointed commercial expectations in that Anderson lost the anticipated profits of its contract with Ledbetter to perform the electrical work." Anderson, 115 Ill. 2d at 153, 503 N.E.2d at 249.

- 16 -

As we observed in our own decision in Anderson (which the supreme court affirmed):

"[Anderson made] no claim for personal injury or property damage; it [sought] only recovery of the additional cost of redoing portions of the project; there [was] no allegation of a sudden[,] calamitous event, only dissatisfaction with the quality of assistance received from Walther." Anderson Electric, Inc. v. Ledbetter Erection Corp., 133 Ill. App. 3d 844, 847, 479 N.E.2d 476, 479 (1985), aff'd, 115 Ill. 2d 146, 503 N.E.2d 246.

In Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill. 2d 137, 636 N.E.2d 503 (1994), the supreme court further clarified the application of the Moorman doctrine to the service industry. It stated:

"The evolution of the economic[-]loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic[-]loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." Congregation of the Passion, 159 Ill. 2d at 162, 636 N.E.2d at 514.

Although the parties in this case explicitly agreed that defendant would refrain from operating on the right stifle, defendant's duty to refrain from doing so did not arise exclusively from the service contract. The parties' agreement in this respect was nothing more than an acknowledgment of defendant's preexisting common-law duty to refrain from altering the horse in any manner except

as authorized by plaintiffs. See <u>Rajkovich v. Alfred Mossner Co.</u>, 199 Ill. App. 3d 655, 659, 557 N.E.2d 496, 499 (1990). "One who exercises any privilege to commit an act which would otherwise be a trespass to a chattel or a conversion is subject to liability for any harm to the interest of another in the chattel caused by dealing with it in a manner which is in excess of the privilege ***." Restatement (Second) of Torts §278, at 507 (1965). In short, "[i]f the actor exceeds the consent, it is not effective for the excess." Restatement (Second) of Torts §892A, at 364 (1965). Contract or no contract, if one cuts, carves, lacerates, incises, or otherwise alters someone else's property except as authorized by that person, one commits a classic tort: either trespass to chattels or conversion, depending on the extent of the alteration.

Essentially, count I of the amended complaint seeks compensation for tortious property damage resulting from the negligent practice of veterinary medicine. The "occurrence"-- laceration with a scalpel--was relatively "sudden," compared with a process of deterioration such as the development of a crack in a grain-storage tank. The occurrence was "dangerous" (<u>Moorman</u>, 91 Ill. 2d at 86, 435 N.E.2d at 450), not only because surgery is inherently dangerous but because "surgery on the stifle [was] very risky." If a veterinarian makes an unauthorized incision on the horse, thereby reducing its value, the nature of the wrong is no different from that of a stranger who walks into the owner's stables and, without authority, cuts the horse. Count I of the amended complaint does not violate the <u>Moorman</u> doctrine.

### D. Conversion

Section 226 of the Restatement (Second) of Torts provides: "One who intention- ally destroys a chattel <u>or</u> <u>so</u> <u>materially</u> <u>alters</u> <u>its</u> <u>physical</u> <u>condition</u> <u>as</u> <u>to</u> <u>change</u> <u>its</u> <u>identity</u> <u>or</u> <u>character</u> is subject to liability for conversion to another who is in possession of the chattel or

entitled to its immediate possession." (Emphasis added.) Restatement (Second) of Torts §226, at 439 (1965). Comment d of section 226 says: "If a horse is permanently lamed, it remains a horse, the owner may still be in possession, and the horse may have value to a glue works, but it has become useless for the ordinary purposes of a horse. In such a case[,] there is a conversion." Restatement (Second) of Torts §226, Comment d, at 440-41 (1965).

In their amended complaint, plaintiffs allege that because of the surgery, the horse is permanently incapacitated from racing and now has only "salvage value"--another way of saying "it may have value to a glue works." Count II pleads a cause of action for conversion.

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand this case for further proceedings.

Reversed and remanded.

STEIGMANN, P.J., and TURNER, J., concur.